**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EDWIGE BINGUE, an individual;
MARJORIE BINGUE, an individual;
and DONALD HOUSE, an individual,
*Plaintiffs-Appellees,*

v.

ELI PRUNCHAK, individually,
*Defendant-Appellant.*

No. 05-16388

D.C. No.
CV-04-01085-JCM

OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted
June 14, 2007—San Francisco, California

Filed January 15, 2008

Before: Jay S. Bybee, Milan D. Smith, Jr., and
N. Randy Smith, Circuit Judges.

Opinion by Judge Bybee

**COUNSEL**

Thomas D. Dillard, Jr. & Felicia Galati, Rawlings, Olson, Cannon, Gormley & Desruisseaux, Las Vegas, Nevada, for the appellant.

Anthony P. Sgro, Steven K. Lewis & Maria Loventime Estanislao, Patti & Srgo, Las Vegas, Nevada, for the appel-lees.

**OPINION**

BYBEE, Circuit Judge:

In *Onossian v. Block*, we applied the Supreme Court's decision in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), and held that a police officer in a high-speed chase—whether he injures the fleeing suspect or a bystander—is entitled to qualified immunity unless his behavior "shocks the conscience" because it demonstrates an intent "to cause harm unrelated to the legitimate object of arrest." 175 F.3d 1169, 1171 (9th Cir. 1999) (internal quotation marks omitted). We were not called upon to consider whether the district court must apply this "intent to harm" standard to *all* high-speed chases, or only those chases that involve "emergencies" or "split-second decisions." Today we refine our *Onossian* analysis and hold, following the Eighth Circuit, that police offi-

cers involved in all high-speed chases are entitled to qualified immunity under 42 U.S.C. § 1983 unless the plaintiff can prove that the officer acted with a deliberate intent to harm. *See Helseth v. Burch*, 258 F.3d 867 (8th Cir. 2001) (en banc). The officer involved in the high-speed chase in this case is entitled to summary judgment based on step one of the qualified immunity analysis as set forth in *Saucier v. Katz*, 533 U.S. 194 (2001). We thus reverse the judgment of the district court.

## I.   BACKGROUND

At approximately 3:41 p.m., on November 29, 2003, officers with the Las Vegas Metropolitan Police Department ("LVMPD") attempted to pull over a stolen Toyota Camry. When the driver refused to stop, a police chase ensued. The chase would last an hour, cover nearly 90 miles, and involve at least a dozen units and a helicopter. Officer Eli Prunchak was at a car dealership "ordering a new door panel for [his] patrol vehicle" when he "heard radio traffic that units were in pursuit of a stolen vehicle . . . heading southbound on Boulder Highway." Based on the radio traffic, Prunchak "thought that [he] was close enough to the pursuit that [he] had a good chance of catching up to it and assisting other officers in apprehension of the suspects." Ten minutes after LVMPD first attempted to stop the Toyota, it entered the southbound lanes of the U.S. 95, a major north-south freeway. At that point, Prunchak "still thought that [he] was close enough to help and did not know at the time how many other units were in pursuit." Calculating that he was "still approximately a half mile to a mile behind the pursuit," Prunchak, with emergency lights active, entered the left lane of southbound U.S. 95.

At about the same time, Edwige Bingue, and her mother, Marjorie Bingue (collectively "Bingue"), were traveling on southbound U.S. 95 when they saw several police units in pursuit of the Toyota.[1] Bingue moved to the right to avoid

---

[1]A third plaintiff, Donald House, is Edwige Bingue's husband. He was not involved in the accident.

those units, and the units safely passed. Minutes later, Prunchak approached—traveling "somewhere around 100 miles per hour"—and while rounding "a long, wide, left curve . . . felt [his] tires slip from underneath [him] and [his] patrol vehicle . . . drift[ ] into the number-two lane." Though there were no cars in the number two lane when Prunchak attempted to regain control of his car, he quickly drifted into the number-three lane and "sideswiped" the driver's side of Bingue's Mercedes. Both vehicles spun out of control and came to rest on the divider between the north and southbound lanes of the freeway. Realizing he was not seriously injured, Prunchak immediately moved to assist Bingue, who was "extremely shaken up, but did not appear to have serious injuries." Shortly after, another unit arrived and relieved Prunchak. Police ultimately stopped the Toyota with spike strips[2] just a few miles from the California border and arrested its three occupants.

Bingue filed this suit in state court against Prunchak, LVMPD, and others alleging state law negligence and, pursuant to 42 U.S.C. § 1983, violations of the Fifth and Fourteenth Amendments.[3] The case was removed to federal court, where Prunchak moved, on qualified immunity grounds, for partial judgment on the pleadings on Bingue's federal claims. The district court denied the motion in a very short order finding "that the issue of what standard to apply [to Bingue's claims] —(1) the 'intent to harm' standard or (2) the 'deliberate indifference'—to determine whether there is a substantive due process violation is a fact-based inquiry that looks at whether deliberation was practical" and that "[Bingue has] demon-

---

[2]Spike strips, also known as tire spikes, are law enforcement devices used to stop suspects fleeing by car. The "spikes" are hollow metal tubes that pierce the tires and cause rapid deflation without explosion. *See, e.g.*, *United States v. Payan-Valenzuela*, Civil No. 06CR2158 JM, 2007 U.S. Dist. LEXIS 68360, at *6 (S.D. Cal. Sept. 14, 2007).

[3]Bingue originally brought a claim under the Fourth Amendment, but concedes that she "abandoned the Fourth Amendment claim by not addressing it below." We, therefore, decline to address this claim here.

strated substantial questions of material fact as to whether [Prunchak] had opportunity to deliberate." Prunchak timely appealed.

## II. JURISDICTION

Bingue argues that we lack jurisdiction to adjudicate the issue of whether Prunchak is entitled to qualified immunity as this is an interlocutory appeal, and our review of such appeals is limited to legal issues. Relying on the district court's characterization of the issue as one of "fact," Bingue argues that our review is limited to the question of "whether the facts alleged support . . . a claim of a violation of clearly established law." *Perez v. Unified Gov't of Wyandotte County*, 432 F.3d 1163, 1166 (10th Cir. 2005), *cert. denied*, 126 S. Ct. 2971 (2006) (internal quotations and citations omitted, alteration in original).[4] We review challenges to our jurisdiction over such interlocutory appeals de novo and reject Bingue's argument. *See Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003) ("We review de novo . . . [an] appeal from a denial of summary judgment based on qualified immunity."); *Rosales-Rosales v. Ashcroft*, 347 F.3d 714, 716 (9th Cir. 2003) ("We determine our own jurisdiction de novo.").[5]

---

[4]Prunchak's motion for qualified immunity arises under Federal Rule of Civil Procedure 12(c), which, as newly amended, provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Since the parties have presented "matters outside the pleadings," Prunchak's "motion [is] treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d). (We quote from the new amendment, effective December 1, 2007. The amendment is "part of the general restyling of the Civil Rules to make them more easily understood . . . . The[ ] changes are intended to be stylistic only." FED. R. CIV. P. 12, advisory committee note (2007 Amendment).)

[5]As a preliminary matter, we have jurisdiction to determine our own jurisdiction. *See Special Invs., Inc. v. Aero Air, Inc.*, 360 F.3d 989, 992 (9th Cir. 2004). Any other rule would place the court and potential litigants in an untenable "Catch-22" situation, stripping the courts of the ability to weigh and consider the merits of the jurisdictional argument, and depriving citizens of a fair adjudication of their claims.

Bingue's argument, presumably, arises from the general principle that the denial of a motion for judgment on the pleadings or "summary judgment is not ordinarily an appealable order," and that when such orders are appealable, as in the qualified immunity context, our jurisdiction is "limited to questions of law and does not extend to claims in which the determination of qualified immunity depends on disputed issues of material fact." *Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001) (per curiam).

**[1]** While this general principle stands, the "denial of summary judgment on qualified immunity grounds is not always unappealable simply because the district court concludes that the issues of fact in dispute are material." *Thomas v. Gomez*, 143 F.3d 1246, 1248 (9th Cir. 1998). Indeed, "[w]here disputed facts exist, . . . we can determine whether the denial of qualified immunity was appropriate by assuming that the version of the material facts asserted by the non-moving party is correct." *Jeffers*, 267 F.3d at 903; *accord Knox v. Sw. Airlines*, 124 F.3d 1103, 1107 (9th Cir. 1997). Alternatively, we may also determine that the disputed facts simply are not material. *See Thomas*, 143 F.3d at 1248 ("[A]n appellate court has jurisdiction to hear an interlocutory appeal where defendants assert that the district court erred in determining that the disputed facts were material.").

**[2]** Applying this rule, we have jurisdiction to determine, based on the facts alleged by Bingue, whether Prunchak is entitled to qualified immunity. Accepting the district court's implied holding—that a court should wait to determine qualified immunity whenever there is a disputed factual issue—would eviscerate the very purpose of qualified immunity, which is "to protect defendants even from defending the action." *Jeffers*, 267 F.3d at 907; *see also Scott v. Harris*, 127 S. Ct. 1769, 1774 n.2 (2007) ("Qualified immunity is 'an *immunity from suit* rather than a mere defense to liability . . . .' Thus, . . . an order denying qualified immunity is immediately appealable even though it is interlocutory . . . ." (quot-

ing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original)); *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (holding that "deny[ing] summary judgment any time a material issue of fact remains on [a § 1983 claim] could undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.' " (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))). We have jurisdiction to adjudicate the merits of this appeal.

## III.   DISCUSSION

We now turn to the merits of the appeal, whether Prunchak is entitled to qualified immunity on Bingue's federal claims. In making this determination, we apply the Supreme Court's two-part sequential test. *See Meyers v. Redwood City*, 400 F.3d 765, 769-70 (9th Cir. 2005). First, as a "threshold question," we ask whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [official's] conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the answer to the question is "no," then no further inquiry is necessary and the official is entitled to a favorable judgment. *Id.* "On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* This second step "must be undertaken in light of the specific context of the case, and not as a broad general proposition." *Id.*

"As in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998). Bingue argues that her Fifth and Fourteenth Amendment substantive due process rights were violated through arbitrary government action. Specifically, she argues that Prunchak's decision to join the high-speed chase was so callous and reckless as to amount to "an abuse of executive power so clearly unjustified by any legitimate objective of

law enforcement as to be barred by the Fourteenth Amendment." *Lewis*, 523 U.S. at 840. Applying the two-part *Saucier* test to each of Bingue's claims, we conclude that Prunchak is entitled to judgment and reverse the district court. We address each of Bingue's claims in turn.

## A.   *Bingue's Fifth Amendment Claim*

**[3]** Bingue first argues that Prunchak's actions run afoul of the Fifth Amendment. This claim is plainly foreclosed by the Constitution. Prunchak is a local law enforcement official, and the Fifth Amendment's due process clause only applies to the federal government. *See Betts v. Brady*, 316 U.S. 455, 462 (1942) ("Due process of law is secured against invasion by the federal Government by the Fifth Amendment and is safeguarded against state action in identical words by the Fourteenth."), *overruled on other grounds by Gideon v. Wainwright*, 372 U.S. 335 (1963); *Castillo v. McFadden*, 399 F.3d 993, 1002 n.5 (9th Cir. 2005) ("The Fifth Amendment prohibits the federal government from depriving persons of due process, while the Fourteenth Amendment explicitly prohibits deprivations without due process by the several States: '*nor shall any State* deprive any person of life, liberty, or property, without due process of law.' " (quoting U.S. CONST. amend. XIV) (emphasis in original)). Bingue has no cause of action under the Fifth Amendment, and the district court erred in failing to dismiss this claim.

## B.   *Bingue's Fourteenth Amendment Claim*

**[4]** Bingue's related Fourteenth Amendment claim is controlled by *Lewis*, which concerned an alleged Fourteenth Amendment violation arising out of the death of a motorcycle passenger who was killed after he was hit by a police car during the high-speed pursuit of that motorcycle. *See Lewis*, 523 U.S. at 836-37. The situation arose when two teenagers failed to stop at a police officer's command and, instead, tried to outrun the officers. *Id*. The chase ended when the motorcycle

tipped over while attempting a sharp left turn; the motorcycle driver was thrown clear of the police car, but the passenger was hit as the police car attempted to brake and skidded into him at about 40 miles an hour. *Id.* The Supreme Court framed the issue as "whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." *Id.* It concluded that even reckless or deliberate indifference was insufficiently shocking to the conscience to form the basis for a substantive due process claim. Reversing our court, the Supreme Court emphasized "that in such circumstances only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." *Id.* The Court concluded that although the officer may have acted irresponsibly, "there [was] no reason to believe that" the officer's reaction was driven by anything other than his "instinct . . . to do his job as a law enforcement officer." *Id.* at 855. Consequently, the Court adopted an "intent to harm" standard holding "that high-speed police chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." *Id.* at 854.

**[5]** Bingue attempts to avoid this result and distinguish *Lewis* on two separate grounds. First, she argues that the cases are distinguishable because, unlike the plaintiff in *Lewis*, who was fleeing on the motorcycle, Bingue was a mere innocent bystander and, therefore, owed a greater duty of care. We rejected this argument in *Onossian v. Block*, 175 F.3d 1169, 1171 (9th Cir. 1999), where we held that *Lewis* applies to injuries resulting from a high-speed police chase *regardless* of whether the injured victim was a fleeing suspect or an innocent bystander. "As we read the Court's opinion [in *Lewis*], if a police officer is justified in giving chase, that justification insulates the officer from constitutional attack, irrespective of

who might be harmed or killed as a consequence of the chase." *Onossian*, 175 F.3d at 1171. In order to prove a due process violation, our case law requires that a bystander injured in a high-speed police chase "must show that the behavior of the police in [his] case [meets the *Lewis* standard and] 'shocks the conscience.' " *Id*. at 1172; *see also Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372-73 (9th Cir. 1998) (reasoning by analogy from *Lewis* that police officers "did not violate the plaintiffs' substantive due process rights to family association when [they] accidently shot and killed [an alleged bystander], because the officers were responding to the extreme emergency of public gunfire and did not intend to commit any harm unrelated to the legitimate use of force necessary to protect the public and themselves.").

Second, Bingue argues that *Lewis*' "intent to harm" standard only applies to cases involving "emergency and nearly instantaneous pursuits," and is not applicable to the situation at hand where Prunchak allegedly had ample time to deliberate. Drawing on language in *Lewis*, Bingue urges us to adopt the less demanding "deliberate indifference" standard in her case and reserve the "intent to harm" standard for situations where the police "have obligations that tend to tug against each other" and must make decisions "in haste, under pressure, and frequently without the luxury of a second chance." *Lewis*, 523 U.S. at 853 (internal quotation marks omitted). At first glance, Bingue appears to be correct that our prior decisions and those of some of our sister circuits support her position. *See, e.g.*, *Moreland*, 159 F.3d at 372 (noting that the critical question to determine whether the "intent to harm" standard applies is "whether the circumstances are such that 'actual deliberation is practical.' " (quoting *Lewis*, 523 U.S. at 851)); *Onossian*, 175 F.3d at 1171 ("Perhaps most telling is [*Lewis'*] description of the dilemma of a police officer who must make a 'split-second' decision whether to pursue a suspect."); *Rivas v. City of Passaic*, 365 F.3d 181, 195-96 (3d Cir. 2004) (holding that under *Lewis* the "intent to harm" standard applies to split-second decisions, but not "where an

official had to act with some urgency"); *Ewolski v. City of Brunswick*, 287 F.3d 492, 510-13 (6th Cir. 2002) ("The time for deliberation available to [police] in deciding how to respond to [a two-day police standoff] distinguishes this case from those in which actual malice and an intent to harm [is] required[,]" such as *Lewis*); *Radecki v. Barela*, 146 F.3d 1227, 1231 (10th Cir. 1998) (holding that under *Lewis*, "in assessing the constitutionality of law enforcement actions, we now distinguish between emergency action and actions taken after opportunity for reflection").

**[6]** It remains an open question in our circuit whether the "intent to harm" standard applies categorically to Fourteenth Amendment due process claims arising out of all high-speed police chases, or whether there are some kinds of high-speed chases in which a "deliberate indifference" standard applies. *See Onossian*, 175 F.3d at 1172 (declining to adopt a categorical rule for high-speed chases). The Eighth Circuit has adopted a categorical rule that "the intent-to-harm standard, rather than the deliberate indifference standard, applies to *all* high-speed police pursuits aimed at apprehending suspected offenders." *Helseth v. Burch*, 258 F.3d 867, 871 (8th Cir. 2001) (en banc) (emphasis in original). *Helseth*, like the case at hand, involved a § 1983 substantive due process claim brought by an innocent bystander injured in a high-speed car chase. *Id.* at 869-70. In granting qualified immunity on that claim, the en banc court expressly overruled an earlier Eighth Circuit opinion holding that a bystander killed during the high-speed pursuit of a stolen car only needed to show deliberate indifference to prevail because the pursuing officer "had ample time to deliberate and weigh" the dangers presented in the six minute chase, *Feist v. Simonson*, 222 F.3d 455, 463-65 (8th Cir. 2000). *See Helseth*, 258 F.3d at 870-71.

The en banc court determined that the original panel had read *Lewis* too narrowly and was focused "on a portion of the Court's justification for [its] holding" and "paid too little heed to the Supreme Court's *holding*." *Id.* at 870 (emphasis in orig-

inal). The court further noted that the original panel's decision would effectively "eviscerate[ ] the holding of *Lewis*" because under that reading courts would be free to reject the intent to harm standard "whenever a judge or a jury could say, with the wisdom of hindsight, that an officer engaged in a high-speed pursuit had ample time to deliberate." *Id*. at 871 (internal quotation marks omitted).

**[7]** The court also noted that drawing such an arbitrary distinction between "emergency" and "non-emergency" situations discounts the split second decisions an officer must make when deciding whether to engage in a high-speed chase. In such circumstances, officers must operate under great pressure and make repeated split-second decisions about how best to apprehend the fleeing suspect in a manner that will minimize risk to their own safety and the safety of the general public. An officer attempting to apprehend a suspect fleeing at high speed does not have the luxury of delay; there is no time for reflection and precious little time for deliberation concerning either the decision to join the chase in the first place or the serial decisions about how best to pursue the suspect. The sheer velocity of a high-speed chase necessarily converts each situation into a genuine "emergency." Trying to sort high-speed chases into the neat categories of "emergency" and "non-emergency" situations is much like trying to bake a cake and having to distinguish between salt and sugar by sight alone: it is a nearly impossible task that has a high likelihood of producing an unpleasant result. Our colleagues on the Eighth Circuit recognized that such a distinction is unsound under *Lewis* because:

> it . . . gives too little recognition to the Court's other bases for [its] holding—its historical reluctance "to expand the concept of substantive due process," 523 U.S. at 842; its explicit reliance on *Whitley v. Albers,* 475 U.S. 312, 320 (1986), which adopted the intent-to-harm standard for a two-hour prison riot, 523 U.S. at 853-54; its doubt whether "it makes sense to speak

of indifference as deliberate in the case of sudden pursuit," 523 U.S. at 851; its recognition that police officers confronting high-speed lawlessness are "subject to countervailing [law] enforcement considerations," 523 U.S. at 855; its concern that any standard less than intent-to-harm "might cause suspects to flee more often, increasing accidents of the kind which occurred here," 523 U.S. at 858 (Kennedy, J., concurring); and the belief of at least some Justices that the question of police officer liability for reckless driving during high-speed pursuits should be decided by the elected branches of government, 523 U.S. at 864-65 (Scalia, J., concurring).

*Helseth*, 258 F.3d at 871. We agree with the Eighth Circuit and decline to try to draw a distinction between "emergency" and "non-emergency" situations involving high-speed chases aimed at apprehending a fleeing suspect.[6] We, therefore, hold

---

[6]Bingue argues that other circuits have either rejected *Helseth* or have held that the *Lewis* "intent to harm" standard only applies where officers lack the time necessary to deliberate. A closer examination of these cases reveals that none of those cases involved high-speed car chases. Instead, in applying *Lewis*, those courts merely reasoned from analogy and extracted from *Lewis* the proposition that when deliberation is impossible, the "intent to harm" standard is more likely to apply. *See, e.g.*, *Moreland*, 159 F.3d at 372 ("While the Supreme Court limited its holding in *Lewis* to the facts of that case (*i.e.*, to high-speed police chases), there is no principled way to distinguish such circumstances from this case."). None of the cases cited hold that some high-speed car chases involve a lower standard of proof than that established by the *Lewis* court. *See, e.g.*, *id.*; *compare Elowski*, 287 F.3d at 511 (holding that, under the *Lewis* framework, a two-day police standoff "falls within the middle-range between custodial settings and high-speed car chases, and likewise conclude that, on balance, the more appropriate standard of review is deliberate indifference." (internal quotation marks omitted)) *with Meals v. City of Memphis*, 493 F.3d 720, 729-32 (6th Cir. 2007) (holding, without any discussion of whether a high-speed police car chase permitted time for deliberation or reflection, that the defendant police officer was entitled to qualified immunity because there was no showing that the police officer acted with intent to harm).

that the *Lewis* standard of "intent to harm" applies to all high-speed police chases. *Cf. Scott*, 127 S. Ct. at 1779 ("A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, . . .").

**[8]** Applying the "intent to harm" standard to the case at hand, we conclude that Prunchak did not act with the requisite intent to harm. The police report filed immediately after the accident reveals that Prunchak joined the high-speed chase in an attempt to do his job and help apprehend the fleeing suspect who posed a danger to the community. He stated that he "heard radio traffic that units were in pursuit of a stolen vehicle." Shortly thereafter he heard additional traffic that the vehicle was entering U.S. 95, near where Prunchak was parked. He wrote that he "thought that [he] was close enough to help and did not know at the time how many other units were in pursuit." The police incident recall logs support Prunchak's statement. Nowhere in the record is there any indication that Prunchak acted with an intent to harm, or had any motive other than a desire to do his job. With the benefit of hindsight, Prunchak's decision to join the pursuit may have been ill-advised and his execution may have been careless, but we cannot say that, from the moment Prunchak heard the call over the radio, he did not believe he was responding to an emergency and acted accordingly; poor judgment alone in a high-speed chase does not violate the Fourteenth Amendment. Because Prunchak's actions do not meet the "intent to harm" standard, he is entitled to judgment under step one of the *Saucier* analysis.

## IV.   CONCLUSION

**[9]** We conclude that high-speed police chases, by their very nature, do not give the officers involved adequate time to deliberate in either deciding to join the chase or how to drive while in pursuit of the fleeing suspect. We hold, therefore, that *Lewis* requires us to apply the "intent to harm" stan-

dard to *all* high-speed chases. Since Prunchak's actions do not meet this stringent standard, Bingue's claim fails under the first step of the *Saucier* analysis and Prunchak is entitled to dismissal. Consequently, we reverse the judgment of the district court and remand for an entry of judgment for Prunchak on the § 1983 claims.

**REVERSED and REMANDED**.