VANASKIE, Circuit Judge, concurring in part and dissenting in part.
 

 I agree with my colleagues that under our state-created danger framework, the facts alleged by Appellee Michael Sauers readily establish that Officer Homanko's conduct was conscience-shocking. I also agree that, going forward, "[p]olice officers now have fair warning that their conduct when engaged in a high-speed pursuit will be subject to the full body of our state-created danger case law." Maj. Op. at 723. I therefore join parts II.A and II.C of the majority's decision in full. However, because I believe that a reasonable officer in Homanko's position would have known on May 12, 2014, that the outrageous conduct alleged in this case was unconstitutional, I respectfully dissent from the majority's finding that Homanko is entitled to qualified immunity.
 

 I.
 

 Under the second prong of the qualified immunity analysis, we must ask "the objective (albeit fact-specific) question whether a reasonable officer could have believed [Homanko's conduct] to be lawful, in light of clearly established law and the information [he] possessed."
 
 Anderson v. Creighton
 
 ,
 
 483 U.S. 635
 
 , 641,
 
 107 S.Ct. 3034
 
 ,
 
 97 L.Ed.2d 523
 
 (1987). In undertaking this analysis, the "key issue" is whether a reasonable police officer in Homanko's position could have believed that driving a police cruiser at speeds in excess of 100 miles-per-hour to catch up to an unsuspecting motorist, who allegedly committed a minor traffic infraction, "comported with established legal standards" as they existed on the date of the accident.
 
 Beers-Capitol v. Whetzel
 
 ,
 
 256 F.3d 120
 
 , 142 n.15 (3d Cir. 2001) (citation omitted). Critically, "it need not be the case that the exact conduct has previously been held unlawful so long as the 'contours of the right' are sufficiently clear such that a 'general constitutional rule already identified in the decisional law' applies with 'obvious clarity' " to the established facts.
 
 Kedra v. Schroeter
 
 ,
 
 876 F.3d 424
 
 , 450 (3d Cir. 2017) (internal citations omitted) (quoting
 
 Anderson
 
 ,
 
 483 U.S. at 640
 
 ,
 
 107 S.Ct. 3034
 
 ;
 
 Hope v. Pelzer
 
 ,
 
 536 U.S. 730
 
 , 741,
 
 122 S.Ct. 2508
 
 ,
 
 153 L.Ed.2d 666
 
 (2002) ). This principle holds true " 'even in novel factual circumstances,' because the relevant question is whether the state of the law at the time of the events gave the officer 'fair warning.' "
 
 Id
 
 . (quoting
 
 Hope
 
 ,
 
 536 U.S. at 741
 
 ,
 
 122 S.Ct. 2508
 
 ).
 

 Here, I agree with the majority that, as of May 2014, it was "clear" that Homanko's conduct would be evaluated pursuant to our Court's sliding scale of culpability.
 
 [1]
 
 Maj. Op. at 717. I also agree with the majority that our Court has "been clear in recent years that the level of culpability required to shock the conscience when an officer has time for hurried deliberation is a conscious disregard of a great risk of serious harm."
 
 Id
 
 . at 717 n.6 (alterations and citations omitted). And, like the majority, I too "have no difficulty in concluding" that an officer who exhibits deplorable judgment and "unjustifiabl[y]" pursues "a potential summary traffic offender at speeds of over 100 miles-per-hour, after radioing for assistance from the neighboring jurisdiction where the potential offender was headed, demonstrates a conscious
 disregard of a great risk of serious harm."
 
 Id
 
 . at 718. Applying these mutually held premises to the question of whether the Sauers' due process rights were clearly established on the date in question, it would appear, therefore, that the majority and I are in agreement that "the contours of the right are sufficiently clear[ ] such that a general constitutional rule already identified in the decisional law applies with obvious clarity" to the established facts.
 
 Kedra
 
 ,
 
 876 F.3d at 450
 
 (internal citations omitted).
 

 Yet despite our conspicuous agreements on the pertinent legal principles and their application to the facts at hand, the majority has concluded that Homanko is entitled to qualified immunity on the ground that the law was not "settled in May 2014 that, absent a specific intent to harm, constitutional liability could be imposed on a police officer engaged in a police pursuit." Maj. Op. at 723 (emphasis added). Justification for such a finding eludes me. To endorse the majority's conclusion, one must accept the proposition that on May 12, 2014, a reasonable police officer-fully informed of the legal principles recited above-would not have considered it conscience-shocking to (1) execute a U-turn into oncoming traffic for the sole purpose of catching a potential traffic offender, and then (2) proceed in breakneck fashion to pursue the unmindful offender at speeds over 100 miles-per-hour, all while being fully aware that there are officers ahead better positioned to execute a stop.
 

 Our case law does not compel such an implausible conclusion. On the date in question here, a reasonable officer undertaking a non-emergency, high-speed pursuit would have known that in police pursuit cases brought under
 
 42 U.S.C. § 1983
 
 , we assess whether an officer's conduct "shocks the conscience" by gauging how much time the officer had to deliberate before deciding to give chase. Maj. Op. at 727 (citing,
 
 inter alia
 
 ,
 
 Brown v. Pa. Dep't of Health & Emergency Med. Servs. Training Inst.
 
 ,
 
 318 F.3d 473
 
 , 480 (3d Cir. 2003) ). Indeed, five years prior to the date in question, the Tenth Circuit held in
 
 Green v. Post
 
 ,
 
 574 F.3d 1294
 
 , 1302-03 (10th Cir. 2009), that
 
 Lewis
 
 's intent-to-harm standard does not apply if-as here-an officer is not engaged in a hot pursuit of a fleeing suspect, but rather is engaged in a non-emergency, high-speed, unilateral pursuit of a suspected offender who is unaware that she is being chased. In such circumstances, the officer's conduct is evaluated under a "middle level [standard] of culpability" that looks to whether the officer acted with "conscious, deliberate indifference to an extreme risk of very serious harm to the plaintiff."
 
 Id
 
 . at 1303. The "middle level standard" applied in
 
 Green
 
 mirrors the "mid-level standard" that we formally adopted in
 
 Sanford v. Stiles
 
 ,
 
 456 F.3d 298
 
 , 307 (3d Cir. 2006), and that the majority applied here.
 
 See
 
 Maj. Op. at 717 n.6.
 

 In my view, qualified immunity should not be granted here simply because there is little case law imposing liability on a police officer who drives his cruiser at speeds in excess of 100 miles per hour in a non-emergency situation. Neither the Supreme Court nor our Court has ever adopted a liability-based litmus test for determining whether a right was clearly established on the date in question.
 
 See
 

 Kedra
 
 ,
 
 876 F.3d at 450
 
 ("[I]t need not be the case that the exact conduct
 
 has previously been held unlawful
 
 so long as the 'contours of the right' are sufficiently clear. ...") (quoting
 
 Anderson
 
 ,
 
 483 U.S. at 640
 
 ,
 
 107 S.Ct. 3034
 
 ) (emphasis added);
 
 see also
 

 Brown v. Muhlenberg Twp.
 
 ,
 
 269 F.3d 205
 
 , 211 n.4 (3d Cir. 2001) ("If the unlawfulness of the defendant's conduct would have been apparent to a reasonable official based on the current state of the
 law, it is not necessary that there be binding precedent from this circuit so advising."). Instead the touchstone of our analysis is reasonableness: "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."
 
 Ashcroft v. al-Kidd
 
 ,
 
 563 U.S. 731
 
 , 743,
 
 131 S.Ct. 2074
 
 ,
 
 179 L.Ed.2d 1149
 
 (2011). And based on the state of the law on May 12, 2014, it is readily apparent to me that a reasonable officer would have known-based on the general constitutional principles delineated in our case law and
 
 Green
 
 's pronouncement that
 
 Lewis
 
 does not apply to unilateral, non-emergency pursuits of a non-fleeing suspect-that the type of conduct exhibited by Officer Homanko was unconstitutional.
 

 The three cases cited by the majority-two of which pre-date
 
 Green
 
 by several years-do not, in my opinion, alter this conclusion. When seeking guidance from our sister courts, "[t]he dispositive question is whether the violative nature of
 
 particular
 
 conduct is clearly established."
 
 L.R. v. Sch. Dist. of Philadelphia
 
 ,
 
 836 F.3d 235
 
 , 248 (3d Cir. 2016) (quoting
 
 Mullenix v. Luna
 
 , --- U.S. ----,
 
 136 S.Ct. 305
 
 , 308,
 
 193 L.Ed.2d 255
 
 (2015) (per curiam) (emphasis in original) ). And the
 
 particular
 
 conduct at issue here is not found in either
 
 Bingue v. Prunchak
 
 ,
 
 512 F.3d 1169
 
 (9th Cir. 2008), or
 
 Helseth v. Burch
 
 ,
 
 258 F.3d 867
 
 (8th Cir. 2001) (en banc), as both of those cases centered on conduct that took place during the hot pursuit of a "fleeing" suspect and, as such, were clearly governed by
 
 Lewis
 
 .
 
 See
 

 Bingue
 
 ,
 
 512 F.3d at 1177
 
 ("We conclude that high-speed police chases, by their very nature, do not give the officers involved adequate time to deliberate in either deciding to join the chase or how to drive while in pursuit of the
 
 fleeing
 
 suspect.") (emphasis added);
 
 see also
 

 Helseth
 
 ,
 
 258 F.3d at 872
 
 ("[The suspect] was a
 
 fleeing
 
 criminal, whose irresponsible high-speed driving endangered countless citizens and ultimately killed one innocent bystander and maimed another. ...") (emphasis added).
 

 Nor did
 
 Sitzes v. City of West Memphis
 
 ,
 
 606 F.3d 461
 
 (8th Cir. 2010), involve the particular conduct at issue here.
 
 Sitzes
 
 involved an accident in February of 2007 when an officer responding to a reported robbery and assault drove his vehicle at speeds between 80 and 90 m.p.h. and collided in an intersection with another car, killing the innocent driver and injuring a passenger. The majority in
 
 Sitzes
 
 relied upon the fact that the officer in question subjectively believed that he was responding to an emergency in holding that the "intent to harm" standard, and not a "deliberate indifference" or "conscious disregard of a great risk of serious harm" standard, applied to the officer's conduct. Significantly, the majority plainly indicated that the "intent to harm" standard would
 
 not
 
 control where the officer did not subjectively believe that the situation presented a real emergency, stating:
 

 Although we are deeply troubled by Officer Wright's actions, we cannot say that the district court erred in applying the intent-to-harm standard in this case. First, we must reject plaintiffs' primary argument, which bases liability on the situation ... not being a "true" emergency.
 
 Terrell [v. Larson],
 
 forecloses inquiry into the objective nature of the emergency, as substantive due process liability turns on the intent of the government actor. 396 F.3d [975], 980 [ (8th Cir. 2005) ]. Thus, the fact that the situation ... was not as serious as those presented in
 
 Helseth
 
 or
 
 Terrell
 
 , or that it might not qualify as an "emergency" under the [police department] Policy and Procedure manual, is not determinative of the appropriate level of scrutiny. Neither is the fact, emphasized by the dissent,
 that Officer McDougal and others testified that they would never have driven in the manner that Officer Wright did, or that Officer McDougal responded to the situation ... differently than Officer Wright. This would all be more relevant if our question was whether the situation was an objectively "true" emergency. However, it bears little relevance to the question of what Officer Wright subjectively believed. ...
 

 We agree with the dissent that our opinion should not be read to establish a rule that an officer can insulate himself from substantive due process liability, no matter the circumstances, by simply averring that he subjectively believed the situation to which he was responding was an emergency.
 
 See
 

 Terrell
 
 , 396 F.3d at 980 n. 2. This could lead to the absurd results forecasted by the dissent. For example, the dissent fears that this case could be used to insulate from substantive due process liability an officer who drove "100 miles per hour through a children's playground during recess time," or an officer who drove "the wrong way down an interstate highway ... when responding to something as routine as a reported accident requiring traffic control[,]" as long as the officer stated that he believed the situation to be an emergency. First, such cases are far beyond the factual scenarios of
 
 Lewis
 
 ,
 
 Helseth
 
 , and
 
 Terrell
 
 , which involved officers using conventional emergency driving techniques to respond to perceived emergencies. Nothing in our opinion would countenance granting summary judgment in either of the two situations presented by the dissent. Second, we think it very likely that an officer who intentionally drove through a playground or the wrong way on an interstate highway could be held liable even under the intent-to-harm standard, regardless of the officer's avowed belief, at least absent some compelling exigency not described in the hypotheticals. In sum, we do not understand this case to establish a per se rule that an officer's self-serving affidavit will always insulate that officer from substantive due process liability. Instead, we simply hold that the plaintiffs have failed to create a genuine issue of fact as to Officer Wright's subjective belief and that this belief is not so preposterous as to reflect bad faith on the part of Officer Wright.
 

 Id.
 
 at 468, 469-70. Thus, far from rejecting application of a conscious disregard standard to police conduct that did not concern an emergency situation,
 
 Sitzes
 
 actually suggests that such a standard does apply when it is clear that the officer was not confronted with an emergency situation. And in our case, we are in full agreement that "[t]here was no emergency at all, and Homanko likely did the most that was warranted when he radioed the police in a neighboring jurisdiction to stop the offender." Maj. Op. at 716. The reliance in
 
 Sitzes
 
 on the officer's belief in that case that he faced an emergency situation can be read as providing notice to law enforcement officers that they are not insulated from liability for engaging in egregiously reckless criminal conduct in a non-emergency context.
 
 [2]
 

 Green
 
 on the other hand-as the majority plainly recognized-"arose in a non-emergency setting and did not involve a suspect fleeing the police in a dangerous manner." Maj. Op. at 720. Those facts-again as the majority recognized-are akin "to the allegations in this case. ..."
 
 Id
 
 . The majority is correct in its assertions that "[w]hen qualified immunity it at issue, context matters" and that courts must "take into account the 'particularized' facts of a case." Maj. Op. at 718.
 
 Green
 
 , therefore, is the only case that addresses the context and
 
 particularized
 
 conduct at issue here. And when read in conjunction with the "general constitutional rule already identified in the decisional law," it is evident-indeed, "obvious"-that a reasonable officer would have known on May 12, 2014, that Officer Homanko's admittedly criminal conduct was unconstitutional.
 
 [3]
 

 Kedra
 
 ,
 
 876 F.3d at 450
 
 (citation omitted).
 

 Our decision in
 
 Kedra
 
 supports this conclusion. There, the mother of a Pennsylvania State Trooper brought a § 1983 claim against a police instructor who accidentally shot a loaded handgun into the trooper's chest during a routine training session, killing him.
 
 Kedra
 
 ,
 
 876 F.3d at 432
 
 . The complaint alleged that the officer's conduct was conscience shocking because he "bypassed all of the safety checks [and] failed to physically or visually inspect the gun to ensure it was unloaded" before pulling the trigger.
 
 Id
 
 . at 433. Like the majority here, we concluded in
 
 Kedra
 
 that the allegations gave rise to the inference that the officer "acted with actual knowledge of a substantial risk of lethal harm" so as to shock the conscience under a then-clearly established theory of deliberate indifference.
 
 Id
 
 . at 448 (citations omitted). We then turned to the question of whether the right at issue-
 
 i.e.
 
 , "an individual's right not to be subjected, defenseless, to a police officer's demonstration of the use of deadly force in a manner contrary to all applicable safety protocols"-was clearly established on the date in question.
 
 Id
 
 . at 449 (footnote omitted). After reciting the general constitutional rules identified in our decisional law and analyzing the facts of a "closely analogous case from the First Circuit," we concluded that a reasonable officer would have had fair warning that the conduct at issue
 was constitutionally prohibited on the date in question.
 
 Id
 
 . at 450-52 (citation omitted).
 

 The same conclusion applies here. The general constitutional principles are clear.
 
 Green
 
 applied those principles to an analogous set of facts. The unconstitutional nature of Homanko's actions, placing at substantial risk those traveling a two-lane, undivided highway in recklessly criminal pursuit of an unsuspecting motorist for a minor traffic infraction, was clearly established when he slammed into the Sauers' vehicle, mortally injuring Mrs. Sauer and severely injuring her husband.
 

 I respectfully dissent.
 

 The Supreme Court in
 
 County of Sacramento v. Lewis
 
 ,
 
 523 U.S. 833
 
 ,
 
 118 S.Ct. 1708
 
 ,
 
 140 L.Ed.2d 1043
 
 (1998), indicated that a sliding scale of culpable conduct applied to determine whether a law enforcement officer's actions were sufficiently conscienceshocking to impose liability, stating that the deliberate indifference "standard is sensibly employed only when actual deliberation is practical."
 
 Id
 
 . at 851,
 
 118 S.Ct. 1708
 
 . There is no dispute here that "actual deliberation" by Homanko was practical.
 

 Contrary to the majority's assertion, we do not minimize the import of the Ninth Circuit's holding in
 
 Bingue
 
 or the Eighth Circuit's holding in
 
 Helseth
 
 . Instead, we rely upon the Eighth Circuit's post-
 
 Helseth
 
 and post-
 
 Bingue
 
 careful delineation between emergency and non-emergency situations articulated in
 
 Sitzes
 
 . We also rely and on the Tenth Circuit's holding in
 
 Green
 
 that the intent to harm standard does not apply in the non-emergency context to conclude that a reasonable police officer would know in May of 2014 that the type of conduct engaged in by Homanko was conscience-shocking such that liability could be imposed.
 

 It bears reiterating that Officer Homanko pled guilty to vehicular homicide and reckless endangerment. A reasonable officer engaged in criminal conduct that resulted in the loss of life and severe personal injuries in a violent collision surely would understand that his conduct would be regarded as sufficiently conscienceshocking so as to preclude the defense of qualified immunity. Indeed, it would appear that his guilty plea would defeat the defense of official immunity under Pennsylvania tort law that would otherwise be available to Officer Homanko for engaging in conduct that fell within the scope of his duties.
 
 See
 
 42 Pa.C.S.A. § 8550 (application of official immunity otherwise available under 42 Pa.C.S.A. § 8446(2) is foreclosed where "it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct."). This reinforces the conclusion that a reasonable law enforcement officer would understand that he could not take another person's life through criminal conduct and yet retain qualified immunity. Notably, in
 
 Kane v. Barger
 
 ,
 
 902 F.3d 185
 
 , 195 (3d Cir. 2018), we held that a law enforcement officer's conduct that merely "resemble[d] the crime of indecent assault" - the officer had touched the plaintiff's intimate parts for his own gratification - was such that "given the egregiousness of [defendant's] violation of [plaintiff's] personal security and bodily integrity, the right here is so 'obvious' that it could be deemed clearly established even without materially similar cases." So, too, here the obviousness of Officer Homanko's violation of the plaintiffs' rights to life and bodily integrity defeats the defense of qualified immunity even in the absence of materially similar cases.