**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARTHUR J. PORTER; CHRISTIE L.
PORTER,

        *Plaintiffs-Appellees,*

        v.

ARTHUR J. OSBORN,

        *Defendant-Appellant,*

        and

JOSEPH WHITTOM,

        *Defendant.*

No. 07-35974

D.C. No.
CV-05-00142-
A-JWS

OPINION

Appeal from the United States District Court
for the District of Alaska
John W. Sedwick, District Judge, Presiding

Argued and Submitted
August 6, 2008—Anchorage, Alaska

Filed October 20, 2008

Before: Dorothy W. Nelson, A. Wallace Tashima and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

14579

## COUNSEL

Ruth Botstein, Assistant Attorney General, Anchorage, Alaska, for the defendant-appellant.

Mark D. Osterman, Mark D. Osterman Law Office, Kenai, Alaska, for the plaintiffs-appellees.

## OPINION

FISHER, Circuit Judge:

   This case raises the question of the appropriate standard of culpability to apply to a police officer who kills a suspect in

the course of investigating a suspicious car parked alongside an Alaska highway, under circumstances that suggest the officer may have helped to create an emergency situation by his own excessive actions. It comes in the context of a lawsuit brought by the parents of the victim, claiming the officer violated their Fourteenth Amendment substantive due process right of familial association with their deceased son. They contend the officer's actions were so outrageous as to shock the conscience. The district court found that the parents presented sufficient evidence that the officer's conduct violated their constitutional rights to warrant a jury trial, but we are compelled to conclude it did so by applying an incorrect standard of culpability to the officer's actions. We therefore reverse and remand for reconsideration of the officer's culpability under the proper standard and whether he is entitled to qualified immunity on summary judgment.

The plaintiffs and appellees are Arthur J. and Christie L. Porter (collectively "the Porters"), who brought this suit after their adult son, Casey Porter, was fatally shot in a brief but tragic confrontation with two Alaska State Troopers. Among several federal and state claims, the Porters principally claimed that their Fourteenth Amendment right of association was violated by the way in which defendant-appellant Arthur J. Osborn ("Osborn") and his fellow trooper Joseph Whittom ("Whittom") handled the roadside incident that resulted in Casey's death. As we discuss in more detail later, the troopers were responding to a call about an apparently abandoned vehicle parked in a highway pull-out area. Osborn, who arrived on the scene first, discovered the car was in fact occupied by Casey, who apparently had been asleep in the driver's seat. In a rapidly escalating confrontation, the troopers shouted at a startled and confused Casey to get out of his car. When he failed to comply, both troopers quickly exited their cars and drew their guns, with Osborn taking the lead in approaching the car to get Casey to comply. When Casey rolled down his window but did not move to get out, Osborn pepper sprayed him through the open window. Casey reacted

in pain and began to drive the car slowly forward toward Whittom's patrol car, at which point Osborn fired five shots at Casey, killing him. Whittom, questioned shortly thereafter by an investigator, expressed his "shock" that "shots were fired . . . in a situation like this."

The district court dismissed all state law claims and all claims against Whittom, none of which are before us on this appeal. As to the Fourteenth Amendment claim, the district court found that there were enough disputed facts to preclude granting Osborn summary judgment on qualified immunity grounds, concluding that a jury could find that Osborn's conduct shocked the conscience under a clearly established "deliberate indifference" standard of culpability.

Osborn has appealed, arguing that his actions did not violate a constitutional standard, but even if they did, the deliberate indifference standard was not clearly established at the time. We conclude that a different and more demanding standard of culpability than deliberate indifference applies. Rather, in an urgent situation of the kind involved here, the established standard is whether Osborn acted with a purpose to harm Casey without regard to legitimate law enforcement objectives. Whether a jury could find Osborn violated *that* standard is not clear on the record before us. Although Osborn appears to have helped create and even exacerbate the confrontation he then ended by deadly force, the parties and the district court will need to readdress Osborn's summary judgment motion under the more stringent purpose to harm standard. We therefore reverse the court's denial of qualified immunity and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Many of the relevant facts are contested or ambiguous, but on Osborn's motion for summary judgment any doubts must be resolved in favor of the Porters' version of events. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1059 (9th Cir.

2006). There is no dispute that it took very little time — probably no more than five minutes — for the entire tragic encounter to play out. Around 2:00 a.m. on January 4, 2003, Trooper Whittom received a call from dispatch regarding a vehicle reported by a highway department employee. The reported vehicle had been parked for about two and a half hours at the Kenai Keys pullout, a large parking lot sized area just off the Sterling Highway in a lightly populated part of the Kenai Peninsula southwest of Anchorage. There was a light snow covering the parking area, and no other vehicles around. The car's lights had been turned on and off whenever the highway employee passed. Trooper Osborn also heard the call and arrived at the scene before Whittom. When Osborn found the car, he initially thought it may have been abandoned, so he turned on his headlights and got out of his car to investigate. He returned to his patrol car to call in the license plate number when "somebody sat up . . . in the drivers seat . . . very — very fast . . . and grabbed the steering wheel and was looking right at me." Osborn testified in his deposition that although it was very dark outside, his headlights were shining eye-level with the driver, Casey, and were bright enough to illuminate the inside of the car. A few seconds later, Casey started slowly steering his car to go around Osborn. At this point, Osborn turned on his overhead flashing blue and red lights "because [Casey] was trying to leave," which Osborn was not prepared to allow "because we were investigating a suspicious vehicle."[1] He admitted that the call to dispatch was the only information at the time indicating Casey's conduct required police intervention.

When Casey did not stop, Osborn moved his car a few inches forward to try to block him. Casey continued to turn,

---

[1]It is unclear whether Osborn ever *verbally* identified himself as a police officer. He did not do so during the tape recorded portion of the incident. The Porters contend that Casey never knew that Osborn or Whittom were officers, given the darkened conditions and lights in Casey's eyes.

so Osborn allowed him to pass because he did not want Casey to hit his car. He testified that "as he drove by my vehicle I looked out my window, we made eye contact and I pointed and said stop the vehicle . . . something like that." Osborn admitted that his window was not down at the time, but emphasized that he had made a motion as well. Whittom arrived as Casey began to maneuver around Osborn, and he tried to pull in front of Casey to stop him from leaving. Whittom's overhead red and blue lights were on and his headlights illuminated Casey's vehicle's interior. Osborn then got out of his car and began walking alongside Casey's slow moving car, ordering him to stop. It was around this time that Osborn activated his tape recorder. The fatal events that followed fill only one page of transcript and approximately two minutes of tape recording.[2]

Casey's car finally stopped about a car's length away from Whittom, at which point both officers shouted orders at him to get out of the vehicle. Whittom did so from either behind or directly in front of his patrol car door with his service weapon out, whereas Osborn did so from within touching distance of Casey's door with his gun in his hand. In the heat of the moment, Whittom ordered Casey to both get in and get out of his vehicle, and he later acknowledged that it may have been confusing to have had two people yelling at once. While the troopers were ordering Casey out of the car, Casey rolled his window down. Osborn did not answer Casey when he asked "what's wrong, sir?" He explained he thought Casey was just "buying time" with this question, that at this point "the contact had already dissolved to a point where he had shown me by his actions that he was going to ignore anything but a command such as get out of the car" and that "[a]t this point he was eluding a police officer." Osborn continued to order him to get out while attempting to enter the car through the front and rear doors.

---

[2]The entire transcript is two pages, with the second page recording Osborn's and Whittom's discussion after the shooting.

Whittom reported that at this point Casey had "a confused look on his face," and kept bringing his hands up above and then below their sight line. This also concerned Osborn, and when Casey started to crank the window up Osborn sprayed pepper spray inside the vehicle. Casey went into a fetal position with his hands over his face moaning, "Ahh . . . I didn't do nothing!" Whittom ducked into his vehicle to tell dispatch that Casey had been sprayed, at which point Osborn described seeing what he called "the calm before the storm":

> Then [Casey's] head snaps up, straight up, and his face is looking straight forward, both of his hands actually reach up and grab the wheel like — like you would grab a steering wheel if you wanted to tear it off the steering column. I mean grabbed it. I mean [I] remember seeing his white knuckles and skin stretched, both hands on the wheel, right and left, lit up in Trooper Whittom's headlights. Then I — and he looked stone cold straight forward. Obviously [he] had ignored every command up to that point, you know, he . . . was not obeying any commands. And then instantly [the] engine revved what sounded to me like full throttle and the tires were spinning and his lights were lighting up Trooper Whittom's uniform from his last known position knowing he's behind the door, I remember seeing blue in the lights. And I fired my weapon until the — I heard the engine down rev and the vehicle was obviously stopped.

Less than a minute elapsed between the pepper spray and the shooting. Whittom admitted that most people try to leave an area once they have been pepper sprayed and that Casey's car never directly hit Whittom; instead, he felt an impact from his own car, whose front brace was hit by Casey's car. In his deposition, Whittom described the impact as something that "wasn't hard, it was just kind of a like a little push on my leg and — and I took a step back. It wasn't like something hit me.

It was just a real gentle kind of push." Whittom also admitted that Casey's car could not go very fast given the short distance that it had to cover.[3] When asked, "the likelihood of . . . being harmed behind that patrol car, was that great?" he responded, "I didn't perceive it as so."

After the accident, around 6:45 a.m., Whittom was interviewed at a nearby post by Dane Gilmore, an investigator with the Alaska State Troopers. He told the investigator that he did not think deadly force was necessary because he was shielded by his vehicle. He explained:

> [M]y initial thought was uh . . . the shock . . . I couldn't . . . couldn't believe that shots were fired in . . . in a situation like this.
>
> * * *
>
> Um . . . you know . . . I guess from my . . . my perspective, I didn't see uh . . . that shots were warranted in this situation. Um . . . I didn't feel any danger to myself when the sus . . . when the driver of the . . or the suspect vehicle decided to um . . . gun it. Um . . . you know he'd already been sprayed and uh . . . and with the conditions that were . . . were there um . . . I don't think that uh . . . you know it was . . . was good use of force. . . . In . . . in . . . in my own . . . uh perspective. And . . . and that's why I didn't return fire or . . . or shoot when . . . um . . . when I saw the vehicle coming towards me. . . . Because I was shielded by my vehicle.

Later, after talking with another investigator, Whittom

---

[3]During his deposition, Whittom agreed the car could not have been going very fast but said he was not sure of the speed when the Porters suggested that it was only a mile or two per hour. Immediately after the incident, he suggested the car had been going about five or 10 miles per hour.

retracted this testimony, reasoning that he must have subconsciously perceived a greater danger because he drew his weapon, took a guard position and released the safety on his weapon when he heard the engine rev. At no time did the officers see Casey with a gun, nor did they recover a weapon from the car.

Originally filed in state court, the Porters' suit was ultimately removed to federal district court. As is pertinent to this appeal, their amended complaint alleged that Osborn violated their Fourteenth Amendment "fundamental liberty interest" in the society of their child, entitling them to relief under 42 U.S.C. § 1983.[4] The district court denied Osborn's motion for summary judgment claiming qualified immunity, finding that the Porters had shown enough to establish the violation of a clearly established constitutional right. No claims personal to Casey are before us. The Porters do not bring any claims on Casey's behalf because they were not appointed to represent his estate. The estate proceeded separately against the defendants and settled out of court. The Porters concede that their claims are therefore limited to their Fourteenth Amendment rights as Casey's parents.

## STANDARD OF REVIEW

A district court's denial of qualified immunity is reviewed de novo. *See Kennedy*, 439 F.3d at 1059. We must view the facts in the light most favorable to the nonmoving party. *See id.* "If a genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003).

---

[4]The Porters brought a host of other claims against other defendants and under various state laws. None of these alternative claims is at issue here, as they were either voluntarily dismissed or dismissed by the district court and subsequently not appealed.

## DISCUSSION

**[1]** To determine whether Osborn is entitled to qualified immunity, the first question is whether the facts show a constitutional violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). "[I]f a violation could be made out on a favorable view of the [non-moving] parties' submissions, the next, sequential step is to ask whether the right is clearly established." *Id.*[5]

**[2]** Here, the potential constitutional violation involves the Porters' Fourteenth Amendment due process right to associate with their son, Casey. *See Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) ("The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child . . . ."); *see also Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998). Whether Osborn committed a constitutional violation under the first step of *Saucier*'s qualified immunity analysis presents two issues. First, we must decide the appropriate standard of culpability to apply to Osborn's conduct to determine whether it "shocks the conscience" under the Fourteenth Amendment's Due Process Clause. *See County of Sacremento v. Lewis*, 523 U.S. 833, 846 (1998). Second, it must be determined whether Osborn's conduct met that standard of culpability, particularly given his role in creating the emergency that led to his fatally shooting Casey. Because we disagree with the district court's determination of the first question and conclude that a stricter standard of culpability applies, we remand so the district court may decide the second issue of whether Osborn's conduct met the stricter standard.

---

[5]The Supreme Court recently granted certiorari in *Pearson v. Callahan*, 128 S. Ct. 1702 (2008), directing the parties to brief the question of whether *Saucier* should be overruled. We proceed under the requirements of current Supreme Court law.

**A.**

**[3]** We begin by clarifying the standard of culpability for a due process right to familial association claim. The parties mistakenly suggest that the choice is between "shocks the conscience" and "deliberate indifference" as the governing standard, when in fact the latter is one subset of the former. The Supreme Court has made it clear, as the district court correctly recognized, that only official conduct that "shocks the conscience" is cognizable as a due process violation. *Lewis*, 523 U.S. at 846 (citing *Rochin v. California*, 342 U.S. 165, 172-73 (1952)). The relevant question on the facts here is whether the shocks the conscience standard is met by showing that Trooper Osborn acted with *deliberate indifference* or requires a more demanding showing that he acted with a *purpose to harm* Casey for reasons unrelated to legitimate law enforcement objectives. *See id.* at 836. In our cases following the Supreme Court's enunciation of the shocks the conscience test in *Lewis*, we have distinguished the "purpose to harm" standard from the "deliberate indifference" standard, recognizing that the overarching test under either is whether the officer's conduct "shocks the conscience." *See, e.g.*, *Moreland*, 159 F.3d at 372.

**B.**

We hold, following Supreme Court precedent and our cases, that the purpose to harm standard must govern Osborn's conduct. Thus, viewing the facts in the light most favorable to the Porters, they must demonstrate that Osborn acted with a purpose to harm Casey that was unrelated to legitimate law enforcement objectives.

**[4]** The Supreme Court's decision in *Lewis*, and several of our cases following it, involved high speed police chases that led to the injury of the plaintiffs or their survivors. The evolution of the case law in this area of the Fourteenth Amendment — perhaps unsurprisingly — has been deferential to officer

decisions to give chase or use force. After all, these officers have been simply reacting to the urgent public safety threat of fleeing motorists in a situation where inaction could be the most dangerous option. The district court here, however, declined to apply the purpose to harm standard established by these cases and instead evaluated the circumstances of Casey's shooting under the deliberate indifference standard, distinguishing *Lewis* and our cases following it. We recognize that the district court drew a principled distinction between police chase cases and the much less obvious public safety threat Casey posed during Osborn's roadside investigation, but our precedent entitles Osborn to the purpose to harm standard of culpability because the "critical consideration [is] whether the circumstances are such that 'actual deliberation is practical.' " *Moreland*, 159 F.3d at 372 (quoting *Lewis*, 523 U.S. at 851). Due to the rapidly escalating nature of the confrontation between Osborn and Casey, we respectfully disagree with the district court that Osborn had an opportunity for the kind of deliberation that has been articulated by *Lewis* and its progeny.

**[5]** In *Lewis*, the Supreme Court recognized that law enforcement officers confront a variety of circumstances that may lead to the use of force, and drew a distinction between situations that evolve in a time frame that permits the officer to deliberate before acting and those that escalate so quickly that the officer must make a snap judgment. Thus, "[a]s the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical." *Lewis*, 523 U.S. at 851. Factually, *Lewis* involved a high speed police chase of a motorcyclist that resulted in a crash, killing the cyclist's teenage passenger. *See id.* at 837. The teenager's survivors alleged that police conduct during the chase violated due process. *See id.* The Supreme Court refused to apply the deliberate indifference standard to high speed police chases, analogizing to cases involving prison riots. "Like prison officials facing a riot, the police on an occasion calling for fast action have obligations that tend to

tug against each other." *Id.* at 853. In such an urgent situation, it concluded, "a deliberate indifference standard does not adequately capture the importance of such competing obligations." *Id.* at 852. Instead, it held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." *Id.* at 854.

The Court relied principally on *Whitley v. Albers*, 475 U.S. 312 (1986), an Eighth Amendment prison riot case involving a guard who had intentionally shot a prisoner to disperse the rioters. *Whitley* held that under such circumstances, "a much higher standard of fault than deliberate indifference has to be shown for officer liability" — that is, " 'whether force was applied in a good faith effort to maintain or restore discipline or *maliciously or sadistically for the very purpose of causing harm*.' " *Lewis*, 523 U.S. at 852-53 (quoting *Whitley*, 475 U.S. at 320-21) (emphasis added).[6]

The Porters argue that *Lewis* applies only to "unintentional" or "inadvertent" killings — such as the motorcycle accident involved there or other innocent bystander types of cases. *See, e.g.*, *Moreland*, 159 F.3d at 372 (characterizing *Lewis* as involving the "unintentional killing of an individual by law enforcement officers"); *but see Whitley*, 475 U.S. at 316 (applying purpose to harm standard to prison officers who intentionally fired shots at inmates). Although intentionality is relevant, intent was not central to the Court's analysis in either *Whitley* or *Lewis* as to which standard to apply. Both

---

[6]Although *Lewis* said that only officer conduct showing a "purpose to cause harm unrelated to the legitimate object of arrest" violates the Fourteenth Amendment, 523 U.S. at 836, the Court elsewhere refers to the standard as "intent to harm." *See Id.* at 854. We discern no distinction between the two formulations. Our own precedent has referred to the *Lewis* standard as "purpose to harm," *Moreland*, 159 F.3d at 372, and "intent to harm," *Bingue v. Prunchak*, 512 F.3d 1169, 1174 (9th Cir. 2008). Here, we use "purpose to harm."

decisions instead turned on whether the officers had the opportunity for actual deliberation. Thus, in *Moreland*, a case involving an apparently inadvertent shooting of a bystander, we emphasized that "the critical consideration [is] whether the circumstances are such that 'actual deliberation is practical.' " 159 F.3d at 372 (quoting *Lewis*, 523 U.S. at 851). Our precedent has evolved with repeated emphasis on this "critical consideration," and in deciding the level of culpability to apply under the shocks the conscience test has declined to parse an officer's intentions and initial decisions to use force. *See, e.g.*, *id.* at 373 (addressing officer conduct only after determining the standard of culpability by reference to the situation the officers faced); *see also Davis v. Township of Hillside*, 190 F.3d 167, 170 (3d Cir. 1999) ("Nothing in *Lewis* suggests that courts are free to second-guess a police officer's decision to initiate pursuit of a suspect so long as the officers were acting in the service of a legitimate governmental objective . . . .") (internal quotation marks omitted).

**[6]** In *Moreland*, police officers responded to a gun fight in a crowded parking lot, a patently fast paced and urgent threat to public safety. *See Moreland*, 159 F.3d at 368. We applied the purpose to harm standard because the officers had to "address a life-threatening situation" in which they faced competing obligations, namely whether to allow the shooters to continue firing or to fire upon the shooters to end the threat. *Id.* at 372. Similarly, in *Onossian v. Block*, 175 F.3d 1169, 1171 (9th Cir. 1999), we held that the purpose to harm standard also applies when bystanders, not the suspects themselves, are harmed during a high speed chase. Analogizing directly to *Lewis* and *Moreland*, we again emphasized the officer's competing obligations in the "split-second" decision to give chase. *See id.* at 1171. Most recently, and after the district court ruled here, we concluded that high speed chases are inherently emergency situations and declined to break them into "emergency" and "non-emergency" situations in which the latter would be evaluated under the deliberate indifference standard. *See Bingue v. Prunchak*, 512 F.3d 1169, 1175-77

(9th Cir. 2008). Otherwise we would wind up parsing officers' "repeated split-second decisions about how best to apprehend the fleeing suspect in a manner that will minimize risk to their own safety and the safety of the general public." *Id.* at 1176. *Lewis* and our cases therefore require that when an officer encounters fast paced circumstances presenting competing public safety obligations, the purpose to harm standard must apply.

At the other end of the spectrum are situations, like the Eighth Amendment prison cases discussed in *Lewis*, where "extended opportunities to do better are teamed with protracted failure even to care." *Lewis*, 523 U.S. at 853. Then, "indifference is truly shocking." *Id.* Similarly, we have held that where officers have ample time to correct their obviously mistaken detention of the wrong individual, but nonetheless fail to do so, the suspect's family members need only plead deliberate indifference to state a claim under the due process right to familial association. *See Lee v. City of Los Angeles*, 250 F.3d 668, 684 (9th Cir. 2001).

**[7]** Placed along this spectrum, we are compelled to conclude that the purpose to harm standard must apply here. Osborn faced an evolving set of circumstances that took place over a short time period necessitating "fast action" and presenting "obligations that tend to tug against each other." *Lewis*, 523 U.S. at 853. The approximately five-minute altercation between Casey and Osborn that ended in Casey's shooting was obviously fast paced — and much shorter in duration than the typical car chase like those in *Lewis*, *Onossian* and *Bingue*. The situation was also quickly evolving and escalating, prompting "repeated split-second decisions." *Bingue*, 512 F.3d at 1176. The case the district court found persuasive, *Lee*, 250 F.3d at 684 (applying deliberate indifference standard to a wrongful incarceration), is quite different, involving as it did a completely controlled situation in which the police committed an obvious and easily detectable mistake of identity that they had time to detect and correct. The dis-

trict court's conclusion that Osborn had opportunity for actual deliberation, and thus that deliberate indifference should apply, assumed that five minutes was enough time for Osborn to consider what he was doing before he acted. However, "deliberation" for purposes of the shocks the conscience test is not so literal a concept. In *Lewis* itself, the Supreme Court rejected the deliberate indifference standard for high speed chases, even though logically an officer giving chase could deliberate even while accelerating after a suspect. *See Lewis*, 523 U.S. at 851 n.11 (explaining that the Court did *not* mean " 'deliberation' in the narrow, technical sense in which it has sometimes been used in traditional homicide law") (emphasis added). Here the events in the pullout were in constant flux, with much yelling, confusion and a driver who was refusing to exit or stop his car. To be sure, the record contains facts suggesting that Osborn's own conduct created and agitated this escalating situation and that his reactions were disproportionate to the situation he faced. Such facts, however, as we explain below, are more relevant to the next step of the analysis, when the district court determines on remand whether they may show Osborn's purpose was to harm Casey for reasons unrelated to legitimate law enforcement objectives.

**[8]** In sum, once Casey's evasive actions began the officers had to react quickly. Under such circumstances, whether Osborn's conduct shocks the conscience must be evaluated under the purpose to harm standard of culpability. That is *Lewis*' teaching as applied in this circuit. *See Bingue*, 512 F.3d at 1175 (discussing *Lewis*, *Moreland* and *Onossian* as requiring purpose to harm where officers must react to an urgent situation and decide whether to pursue a suspect).

## C.

**[9]** For the Porters to show that Osborn's shooting of Casey shocks the conscience under the purpose to harm standard of culpability they must prove that his purpose was "to cause harm unrelated to the legitimate object of arrest." *Lewis*, 523

U.S. at 836. More specifically, "[i]t is the intent to inflict force beyond that which is required by a legitimate law enforcement objective that 'shocks the conscience' and gives rise to liability under § 1983 . . . ." *Davis v. Township of Hillside*, 190 F.3d 167, 172 (3d Cir. 1999) (McKee, J., concurring). The parties do not dispute that this standard of culpability was clearly established at the time of the shooting in 2003. Thus, whether Osborn is entitled to qualified immunity on summary judgment turns on whether the Porters can present facts to the district court that would justify a jury finding that Osborn acted with an unconstitutional purpose to harm Casey. We remand for that determination.[7]

Although our cases contain guidance mostly about officers' intentions and actions that *do not* evidence a purpose to harm, a close reading of *Lewis* and our cases following it indicates what kind of conduct *does* reveal a purpose to harm. In *Lewis* itself, the Supreme Court held that a purely reactive decision to give chase evidenced no intention to "induce . . . lawlessness, or to terrorize, cause harm, or kill." *Lewis*, 523 U.S. at 855. The Supreme Court left open the possibility that liability can still attach under *Lewis* where a plaintiff proves particularly objectionable conduct. *See Davis*, 190 F.3d at 172-73 (McKee, J., concurring). We agree with Judge McKee's concurring opinion in *Davis*, a Third Circuit police chase case, which reasons that where force against a suspect is meant only to "teach him a lesson" or to "get even" then "*Lewis* would not shield the officers from liability even though they were ultimately effectuating an arrest." *Id. Lewis* contemplates such "rare situations where the nature of an officer's deliberate physical contact is such that a reasonable factfinder

---

[7]The Porters' argument that Osborn's actions shock the conscience under the purpose to harm standard is not waived, as Osborn asserts. The Porters' complaint alleged that Osborn's acts were intentional, willful and wanton, and their response to the motion for summary judgment argued that Osborn's actions were unjustified by any legitimate objective of law enforcement even though they argued that the deliberate indifference standard was appropriate under the facts here. Osborn has not been prejudiced.

would conclude the officer intended to harm, terrorize or kill." *Id.* at 174 (internal quotation marks omitted).

This reasoning is entirely consistent with our cases interpreting *Lewis*. In *Bingue*, we held that an officer did *not* act with purpose to harm where the officer believed he was "*responding* to an emergency." 512 F.3d at 1177 (emphasis added). In *Moreland*, 159 F.3d at 373, we examined officer conduct under the purpose to harm standard and held that "because the officers were *responding* to the extreme emergency of public gunfire" they did not intend any harm unrelated to law enforcement objectives. When an officer creates the very emergency he then resorts to deadly force to resolve, he is not simply responding to a preexisting situation. His motives must then be assessed in light of the law enforcement objectives that can reasonably be found to have justified his actions.

This is the kind of analysis applied in the analogous jurisprudence governing constitutional claims of excessive force under the Fourth Amendment, in cases involving claims by or on behalf of the victim himself. In such a case, the Fourth Amendment's reasonableness test applies, *see Scott v. Harris*, 127 S. Ct. 1769, 1777 (2007), tempered by the special constitutional rules governing deadly force. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Price v. Sery*, 513 F.3d 962, 966-67 (9th Cir. 2008). Although a different standard of culpability applies to the Porters' due process claim, this context implicates precisely the same delicate balancing act between citizens' rights to be free from undue police force and the legitimate safety concerns of officers who make these life and death decisions. Thus, in both contexts, courts reviewing deadly force in response to a supposed public safety threat are presented with a "factbound morass," especially when on first glance an officer's use of deadly force appears disproportionate to the nature of the threat. *Price*, 513 F.3d at 974, 978 (Fisher, J., concurring) (describing a 24-second confrontation in which an officer approached a parked car and fatally shot

its driver). In the Fourth Amendment context, this requires courts to take into account "both the nature of the perceived threat and the soundness of the officer's basis for making that assessment." *Id.* (Fisher J., concurring). Similarly, under the Fourteenth Amendment, *Lewis* holds that a denial of due process "is to be tested by an appraisal of the totality of facts in a given case." *Lewis*, 523 U.S. at 850. We are unable, on the record before us, to make the appropriate factbound appraisal to determine whether Osborn's actions were undertaken to "induce . . . lawlessness, or to terrorize, cause harm, or kill" Casey. *Id.* at 855.

**[10]** Nonetheless, there are several facts relevant to an unlawful purpose to harm that need to be considered on remand — that is, to assess whether under the totality of the circumstances a jury could infer that Osborn was acting for purposes other than legitimate law enforcement. First is the nature of the suspicious car and driver Osborn found in the pull-out near the Sterling Highway. The lone car was stationary and posed no overt threat to officer safety at the outset. Once Casey started moving the car, he created at least a minimal threat to safety, although hardly on the level of a car chase. Trooper Whittom reported that he did not feel threatened by Casey's car, but he and Osborn nevertheless drew their guns. Second is the nature of the back and forth between Casey and the troopers. In response to Casey's rolling his window down and refusing to exit the vehicle, Osborn precipitously sprayed him with pepper spray, an action that could be viewed as punishing or harassing when it is unclear whether Casey even knew he was dealing with law enforcement. Whittom's testimony suggests Casey's attempt to drive away may have been a normal effort to escape further spraying, making Osborn an active participant in triggering Casey's flight. Third and most important is Osborn's severe and sudden escalation of the situation: where Casey's only violation was noncompliance, Osborn's extraordinary response was to fire five shots, which shocked even Whittom.

There are other facts suggested by the record that may also bear on Osborn's intent, but they are not clearly developed. For instance, it is not clear whether Osborn was in compliance with Alaska State Trooper regulations governing the use of force, or whether expert testimony might show that Casey was driving slowly *away from* Whittom at the time he was shot. Although Osborn may be able to show indisputably that his actions all accorded with proper law enforcement purposes, on the record before us, we are unable to decide in the first instance whether the Porters have presented enough facts to survive summary judgment.

## CONCLUSION

**[11]** We hold that the purpose to harm standard governs the applicable level of culpability needed to shock the conscience here, because Osborn faced a fast paced, evolving situation presenting competing obligations with insufficient time for the kind of actual deliberation required for deliberate indifference. We remand to the district court to review Osborn's conduct under the proper Fourteenth Amendment standard and determine whether the facts, when taken in the light most favorable to the Porters, show that Osborn's actions shock the conscience because he acted with a purpose to harm for reasons unrelated to legitimate law enforcement objectives.

## REVERSED AND REMANDED.