**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LEONORILDA OCHOA, individually;
RACHEL GARCIA, on behalf of S.G.
on behalf of G.G.; KERRY LYNN
CONIGLIO, on behalf of C.J.C;
DEANNA MENDOZA; ERIKA GARCIA,
on behalf of minor statutory
beneficiaries J.G. and J.G,
          *Plaintiffs-Appellants,*

v.

CITY OF MESA, a public entity;
TOWN OF GILBERT, a public entity;
MANUEL R. CELAYA, JR.; ROBERT E.
GAMBEE, JR.; JESS C. NICHOLSON;
KARI R. SAVAGE; BRIAN K. HERMES;
STEVE GILBERT; JACOB MADUENOS;
JASON G. STOUT,
          *Defendants-Appellees.*

No. 20-16069

D.C. No.
2:18-cv-00905-
JJT

OPINION

Appeal from the United States District Court
for the District of Arizona
John Joseph Tuchi, District Judge, Presiding

Argued and Submitted November 18, 2021
Phoenix, Arizona

Filed February 28, 2022

Before:  Ronald Lee Gilman,[*] Consuelo M. Callahan, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge Callahan

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's summary judgment in favor of police officers in an action brought pursuant to 42 U.S.C. § 1983 alleging defendants violated plaintiffs' Fourteenth Amendment rights to companionship and familial association when they shot and killed Sergio Ochoa.

The panel noted that plaintiffs' Fourteenth Amendment claim requires that the officers' conduct "shocks the conscience"—a standard that is more demanding of the plaintiffs than the Fourth Amendment standard typically applicable in police shooting cases. Because the officers here did not have time to deliberate before firing, the district court correctly applied the purpose-to-harm test to determine if the officers' conduct shocked the conscience.

The panel noted that at the time of the shooting, the officers knew that in the past few hours Ochoa had: engaged

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

in a domestic dispute that allegedly involved a gun while possibly under the influence of heroin or meth; allegedly entered a stranger's home stating that he was armed with knives; failed to yield when a marked police car tried to pull him over; and had driven erratically, including on the wrong side of the road directly at police officers.  When the officers arrived at the home where Ochoa was later shot, the situation escalated. They encountered a frantic man who said that Ochoa did not belong at the house and who was evacuating children from a locked bedroom out of the house through a second-story window.  Ochoa ignored repeated commands to come outside and drop any knives he was carrying. As the officers entered the front door, Ochoa ran into the backyard, where he refused to drop two kitchen knives despite multiple commands from the police to do so.  He then took a large step. Knowing what Ochoa had done earlier in the evening, the officers had to make a snap decision about Ochoa's intentions and the threat he posed to them, the people in the home, and the public at large.

The district court correctly concluded that under the purpose-to-harm test, the conduct did not violate the plaintiffs' Fourteenth Amendment rights. The officers' actions instead reflected their attempts to satisfy legitimate law enforcement objectives: apprehension of an armed, dangerous suspect and protection of the safety of the officers, the home's inhabitants, and the public.

## COUNSEL

Jody Lynn Broaddus (argued) and Marc J. Victor, Attorneys for Freedom Law Firm, Chandler, Arizona; David J. Catanese, Zachar Law Firm P.C., Phoenix, Arizona; Benjamin Taylor, Taylor & Gomez LLP, Phoenix, Arizona; for Plaintiffs-Appellants.

Duncan J. Stoutner (argued), Mesa City Attorney's Office, Mesa, Arizona; for Defendants-Appellees City of Mesa, Manuel R. Celaya Jr., Robert E. Gambee Jr., Jess C. Nicholson, Kari R. Savage, Brian K. Hermes, and Jason G. Stout.

Robert Grasso Jr. (argued) and N. Patrick Hall, Grasso Law Firm P.C., Chandler, Arizona; for Defendants-Appellees Town of Gilbert, Steve Gilbert, and Jacob Maduenos.

## OPINION

CALLAHAN, Circuit Judge:

In 2016, police officers in Arizona shot and killed Sergio Ochoa. Ochoa's family sued the officers and the municipalities they worked for, alleging that they violated the Fourteenth Amendment under 42 U.S.C. § 1983 by wrongfully depriving the plaintiffs of Ochoa's companionship and familial association, and that they violated Arizona law by wrongfully killing Ochoa. The plaintiffs did not assert any claims on behalf of Ochoa's estate. The district court granted the defendants summary judgment on the Fourteenth Amendment claim. The plaintiffs appealed.

We review the district court's decision de novo. The plaintiffs' Fourteenth Amendment claim requires them to show that the officers' conduct "shocks the conscience"—a standard that requires more of the plaintiffs than the Fourth Amendment excessive-force standard often applied in police shooting cases. Viewing the record in the light most favorable to the plaintiffs, the district court selected the correct legal test to assess whether the conduct here shocks the conscience, and it correctly concluded that it does not. Thus, the defendants did not violate the plaintiffs' Fourteenth Amendment rights. We therefore affirm the judgment of the district court.

## Background

On the night of March 3, 2016, a Mesa police dispatcher radioed officers. A 911 caller had told the dispatcher that she and her ex-boyfriend—Ochoa—had a fight and that a handgun was involved. The caller said that Ochoa used heroin and meth, was under the influence of drugs, and had left by car. Dispatch said that Ochoa had outstanding arrest warrants.

About eight minutes after the first 911 call, dispatch radioed the officers about another 911 call nearby. The second caller told dispatch that a man entered the caller's home without permission and said that he had two knives and that his girlfriend had stabbed him. The intruder left in a car matching the description of the car from the first 911 call. A police helicopter found and followed the car.

The police realized that Ochoa had prompted both 911 calls. A marked police car tried to pull Ochoa's car over, but it did not stop. The helicopter followed Ochoa's car and worked with police on the ground to track its movements. Officers saw Ochoa driving erratically (including on the

wrong side of the street towards police cars) and inexplicably stopping at green traffic lights. The officers then lost sight of the car. The helicopter pilot reported that Ochoa had abandoned the car in a residential neighborhood near the border between Mesa and the adjoining town of Gilbert. A police officer on the ground spotted the car, and the helicopter pilot told the officer that Ochoa had fled to a nearby home.

When the officer went to the home, a frantic man on the second story shouted "Hey, he's in here, he's in here!" Another officer arrived and asked the man if Ochoa was supposed to be there. The man answered, "Fuck no!" and told the officers that he had children with him in a locked bedroom. As more police converged on the location, the man brought several children onto the roof to evacuate them with the help of two officers.

Meanwhile, the home's front door was closed, but through a window officers could see people yelling in a back room. Ochoa momentarily appeared at a window in the front door and then at the front window, looking upset and possibly holding a knife. He ignored commands to come outside. One officer, who was a drug-recognition expert, thought that Ochoa was under the influence of meth.

Fearful that a hostage situation was developing, the officers decided to enter the house. The lead officer kicked open the front door and led a line of seven police officers into the home. Another officer went around the side of the house to prevent Ochoa from fleeing to neighboring homes. The police entering the home saw Ochoa go into the backyard through a sliding glass door and followed him. Standing between Ochoa and the home, the officers formed an L-shape around Ochoa. Ochoa had two knives in one hand and refused to obey the officers' commands to "Drop

the knife, drop the knife!" According to the officers, Ochoa looked angry and ready to fight.

Police bodycam video captured what happened next. One officer fired a beanbag round at Ochoa. Seemingly simultaneously, another officer released a police dog. Perhaps reacting to the beanbag round or to the dog, Ochoa took a large step sideways (and, accepting the plaintiffs' characterization, away from the officers). The officers then fired about 30 shots at Ochoa. He fell to the ground on his stomach, with at least one of his hands tucked near his waistline. Ochoa did not respond to commands to pull his hands out. While some officers went inside to clear the home, the remaining officers say that they commanded the dog to drag Ochoa so that his hands were visible.

Ochoa died at the scene. A postmortem toxicology report showed that he had meth in his system. Two knives were recovered from the backyard. Bodycam video shows that about 16 seconds elapsed between the officers' first entry into the home and the shooting.

Following the shooting, Ochoa's children, through their mothers, and Ochoa's mother filed this lawsuit on their own behalf. The parties and claims have changed over the course of the case. The remaining defendants are the Town of Gilbert and two Gilbert police officers, as well as the City of Mesa and seven Mesa police officers. In the two remaining claims, the plaintiffs allege that the defendants (1) violated the Fourteenth Amendment under 42 U.S.C. § 1983 by wrongfully depriving the plaintiffs of Ochoa's companionship and familial association and (2) violated Arizona law, A.R.S. § 12-611, by wrongfully killing Ochoa. At oral argument, the plaintiffs confirmed that Ochoa's estate has not separately asserted any claims related to this shooting, including any Fourth Amendment claims.

After removing the case from state court to federal court, the defendants moved for summary judgment. Among other things, the defendants asserted that they were protected by qualified immunity—a legal doctrine that shields government officials from liability for alleged constitutional violations—because there was no violation of a clearly established Fourteenth Amendment right.

The district court ruled in the defendants' favor on the Fourteenth Amendment claim. It remanded the state-law wrongful-death claim back to state court and declined to rule on other issues raised by the defendants. The court entered a final judgment, and the plaintiffs timely appealed to this court.

## Legal Standards

We have jurisdiction to review the district court's grant of summary judgment and entry of judgment because they are the district court's final decisions. *See* 28 U.S.C. § 1291. We review an order granting summary judgment de novo. *Geurin v. Winston Indus., Inc.*, 316 F.3d 879, 882 (9th Cir. 2002). Applying the same standards as the district court, we affirm a grant of summary judgment if "there is no genuine dispute as to any material fact" when viewing the record in the light most favorable to the nonmoving party, such that the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is one that is needed to prove (or defend against) a claim, as determined by the applicable substantive law. *Id.* at 255.

Here, the plaintiffs' claim—and thus the applicable substantive law—is rooted in the Fourteenth Amendment. The Amendment states in relevant part that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "[A] parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child and . . . a 'child's interest in her relationship with a parent is sufficiently weighty by itself to constitute a cognizable liberty interest.'" *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (citations omitted) (quoting *Smith v. City of Fontana*, 818 F.2d 1411, 1419 (9th Cir. 1987)).

A claim asserting that police officers violated these Fourteenth Amendment rights during a police shooting must show that the officers' conduct "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). There are two tests used to decide whether officers' conduct "shocks the conscience." Which test applies turns on whether the officers had time to deliberate their conduct.

On one hand, the deliberate-indifference test applies if the situation at issue "evolve[d] in a time frame that permits the officer to deliberate before acting." *Porter*, 546 F.3d at 1137. Deliberation is not possible if the officers "encounter[ed] fast paced circumstances presenting competing public safety obligations." *Id.* at 1139. Deliberation in this context "should not be interpreted in the narrow, technical sense." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

On the other hand, the purpose-to-harm test applies if the situation at issue "escalate[d] so quickly that the officer [had to] make a snap judgment." *Porter*, 546 F.3d at 1137. This test requires "a more demanding showing that [the officers]

acted with a *purpose to harm* [the decedent] for reasons unrelated to legitimate law enforcement objectives." *Id.* Legitimate objectives can include "arrest, self-protection, and protection of the public." *Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018). Illegitimate objectives include "when the officer 'had any ulterior motives for using force against' the suspect, such as 'to bully a suspect or "get even,"' or when an officer uses force against a clearly harmless or subdued suspect." *Id.* (citations omitted) (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 798 (9th Cir. 2014); *Wilkinson*, 610 F.3d at 554).

Whether evaluated under the deliberate-indifference test or the purpose-to-harm test, the Fourteenth Amendment "shocks the conscience" standard is not the standard that typically comes to mind in police shooting cases. Another standard—the standard applicable to Fourth Amendment excessive-force claims—is more familiar in this context. That standard asks whether the officers' conduct was "objectively unreasonable." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

We have previously recognized that applying the Fourth Amendment excessive-force standard to a Fourteenth Amendment claim for loss of companionship and familial association following a fatal police shooting might have "surface appeal." *Byrd v. Guess*, 137 F.3d 1126, 1133–34 (9th Cir. 1998), *superseded by statute on other grounds as recognized in Little v. City of Manhattan Beach*, 21 F. App'x 651, 652 (9th Cir. 2001). The gist of the two claims is the same: an officer is accused of improperly using police power to kill someone.

But the Fourteenth Amendment standard applicable to a claim by a relative demands more of such a plaintiff than a Fourth Amendment claim by the victim of an officer's

actions. *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 n.4 (9th Cir. 1998), *as amended* (Nov. 24, 1998). The Supreme Court has held that "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) (omission in original) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). The plaintiffs here cannot sidestep this prohibition and assert Ochoa's Fourth Amendment rights through a Fourteenth Amendment claim. *See Byrd*, 137 F.3d at 1134. Instead, they must show more: not just that the officers' actions were objectively unreasonable and thus violated Ochoa's Fourth Amendment rights, but that the officers' actions "shock[ed] the conscience" and thus violated the plaintiffs' Fourteenth Amendment rights. *See Porter*, 546 F.3d at 1137.

This difference in standards can be dispositive where relatives assert Fourteenth Amendment claims but there is no Fourth Amendment claim. Indeed, "it may be possible for an officer's conduct to be objectively unreasonable [under the Fourth Amendment] yet still not infringe the more demanding standard that governs substantive due process claims [under the Fourteenth Amendment]." *Moreland*, 159 F.3d at 371 n.4.

## Analysis

The district court in this case correctly applied the Fourteenth Amendment standard. Viewed in the light most favorable to the plaintiffs, the record supports the district court's decision to apply the purpose-to-harm test and its conclusion that the officers' conduct did not shock the conscience. Therefore, the officers did not violate the plaintiffs' Fourteenth Amendment rights.

The officers did not have time to deliberate before shooting Ochoa. At the time of the shooting, the officers knew that in the past few hours Ochoa had: engaged in a domestic dispute that allegedly involved a gun while possibly under the influence of heroin or meth; allegedly entered a stranger's home stating that he was armed with knives; failed to yield when a marked police car tried to pull him over; and driven erratically, including on the wrong side of the road directly at police officers.

When the officers arrived at the home where Ochoa was later shot, the situation escalated. They encountered a frantic man who said that Ochoa did not belong at the house and who was evacuating children from a locked bedroom out of the house through a second-story window. Meanwhile, downstairs Ochoa appeared angry and agitated around other people while armed with at least one knife. He ignored repeated commands to come outside and drop any knives he was carrying. As the officers entered the front door, Ochoa ran into the backyard, where he refused to drop two kitchen knives despite multiple commands from the police to do so. He then took a large step. Knowing what Ochoa had done earlier in the evening, the officers had to make a snap decision about Ochoa's intentions and the threat he posed to them, the people in the home, and the public at large. The urgency of that moment—caused by Ochoa's failure to follow police commands—forced the officers to react instantly, without deliberation. Given the undisputed facts, the district court correctly chose to apply the purpose-to-harm test.

Under this test, the officers' conduct was consistent with legitimate law enforcement objectives and did not violate the Fourteenth Amendment. As the district court noted, when officers confronted Ochoa, "at least four law enforcement

objectives [were] apparent: officer safety, protection of the occupants still inside the home, apprehension of an apparently dangerous suspect, and protection of the public at large in the event [Ochoa] escaped from the backyard."

There is nothing in the record suggesting that the officers had an improper purpose to harm. There is no allegation that the officers sought to bully Ochoa or get even with him. There is no indication that the officers had prior dealings with Ochoa. At most, there are assertions that the officers continued to shoot Ochoa when he was on the ground and that when the officers directed the police dog to drag Ochoa so they could see his hands, the officers laughed and cheered. But as the plaintiffs confirmed at oral argument, there is no direct evidence anywhere in the record supporting either of these allegations.[1] Such assertions, without evidentiary support, do not create a genuine issue of material fact. *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007).

Further, even if we accepted the truth of these two unsubstantiated assertions, they do not show that the officers acted with an improper purpose to harm. As to the assertion about the continued firing, several officers testified that they were concerned that Ochoa still had access to the knives (which were later recovered from the area where Ochoa was shot) because they could not see at least one of his hands near his waistband. *See Foster*, 908 F.3d at 1211 ("A police officer lacks such legitimate law enforcement objectives . . . when an officer uses force against a clearly harmless or

---

[1] As confirmed by the plaintiffs at oral argument, the only support in the record for these assertions is a statement by the plaintiffs' retained expert. That is insufficient, particularly in the face of sworn denials from the officers. *See Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019) ("Expert testimony cannot create a genuine issue of material fact if it rests on assumptions that are not supported by evidence.").

subdued suspect."). This reflects a legitimate law enforcement objective: the safety of the officers and others. As to the contested (though unsupported) assertion about the cheering and laughing, it has minimal relevance because it relates to events that took place after the officers fired at Ochoa.

Other assertions made by the plaintiffs also carry little weight. For example, the plaintiffs note that Ochoa had always been welcome in the home where he was shot and that the women there (later identified as Ochoa's ex-wife and her mother) were not afraid of Ochoa. But the officers did not know this at the time. As the plaintiffs conceded at oral argument, the analysis focuses on what the officers knew in the moment, not what became known hours, days, or weeks later.

Finally, the plaintiffs' suggestion that the officers created the emergency that led to the shooting is not well taken considering Ochoa's alleged violence, flight, and failure to follow police commands earlier that evening. This incident was not instigated by police.

In sum, the record does not show that the officers acted with a purpose to harm unrelated to a legitimate law enforcement objective. Rather, it reflects that the officers took steps to ensure that a fleeing, armed, and noncompliant suspect would not further endanger the officers, the home's inhabitants, and the public. On this record, the officers' conduct does not shock the conscience and the officers did

not violate the plaintiffs' rights under the Fourteenth Amendment.[2]

## Conclusion

The plaintiffs' Fourteenth Amendment claim requires that the officers' conduct "shocks the conscience"—a standard that is more demanding of the plaintiffs than the Fourth Amendment standard typically applicable in police shooting cases. Because the officers here did not have time to deliberate before firing, the district court correctly applied the purpose-to-harm test to determine if the officers' conduct shocks the conscience. The court correctly concluded that under that test, the conduct did not violate the plaintiffs' Fourteenth Amendment rights. The officers' actions instead reflect their attempts to satisfy legitimate law enforcement objectives: apprehension of an armed, dangerous suspect and protection of the safety of the officers, the home's inhabitants, and the public. The district court's grant of summary judgment is **AFFIRMED**.

---

[2] Because we agree that there was no Fourteenth Amendment violation and affirm summary judgment on that basis, we do not address the second prong of the qualified-immunity test described by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), which asks if the right at issue was clearly established at the time the officer acted, such that the officer would have (or should have) known to not act in a way that violated it. This is consistent with the suggested approach for qualified-immunity issues. *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all."); *Monzon v. City of Murrieta*, 978 F.3d 1150, 1156 (9th Cir. 2020) ("Only if we conclude that the officers *did* violate a constitutional right would we then need to proceed to the second step of the inquiry . . . .").