Filed 7/29/15

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| LOIS JEAN GREEN, | D067424 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. RIC523816) |
| COUNTY OF RIVERSIDE et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Riverside County, Sherrill A. Ellsworth, Judge.  Affirmed.


Purcell Law and Chris Purcell for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Arthur K. Cunningham; Arias & Lockwood and Christopher D. Lockwood for Defendants and Respondents.

Lois Jean Green filed an action for violation of civil rights and the Fourteenth Amendment under 42 United States Code section 1983 (section 1983) and wrongful death under California law against the County of Riverside, and Riverside County Deputy Sheriffs Christopher Cazarez, Mark Janecka and David Dietrich, arising out of

the death of her son, Lawrence Rosenthal, while in the officers' custody. After an 18-day trial, the jury returned a special verdict finding that only Cazarez used unreasonable force, but that force was not a substantial factor in causing Rosenthal's death. The court entered judgment against Green and awarded costs of suit to the defendants.

Green contends the trial court (1) committed prejudicial error in admitting evidence that Rosenthal was under the influence of cocaine, (2) erred in refusing to instruct the jury on negligence, and (3) improperly awarded paralegal fees as costs. Finding no merit in Green's contentions, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

"As required by the rules of appellate procedure, we state the facts in the light most favorable to the judgment." (*Orthopedic Systems, Inc. v. Schlein* (2011) 202 Cal.App.4th 529, 532, fn. 1.)

In August 2008, Anthony Padilla, a licensed and armed security guard at Valle Vista Assembly of God Church in Hemet, California, saw Rosenthal, clad only in boxer shorts, running in place in sprinklers at the church and saying he was on fire and attempting to cool off in the water. Thinking that someone might get hurt, Padilla called 911 to get medical help for the confused and distraught Rosenthal.

Deputy Cazarez arrived while Padilla was still talking to the 911 operator. Padilla told Cazarez that Rosenthal was not in his right mind, and Cazarez saw Rosenthal running around and making erratic movements. Concerned for his own safety and for the safety of others nearby and believing that Rosenthal might be under the influence of drugs, Cazarez approached Rosenthal and tried to calm him down; despite Cazarez's

2

effort, Rosenthal's erratic behavior continued, and Cazarez became concerned that he might run out onto the adjoining state highway where traffic was proceeding at approximately 45 to 50 miles per hour. After Rosenthal began yelling that a bomb would go off and became more agitated when the sprinklers stopped spraying, Cazarez called for backup.

When Deputies Janecka and Dietrich arrived, Rosenthal turned toward their vehicle, yelled at them and continued his erratic movements. Displaying their batons, the three officers approached Rosenthal, each from a different side. Because the officers believed Rosenthal was under the influence of drugs, proper police practices required them to detain him, and Cazarez felt it necessary to take Rosenthal into custody for a mental status evaluation under Welfare and Institutions Code section 5150.

The deputies ordered Rosenthal to get on the ground, but he did not comply. Instead, Rosenthal took a fighting stance and moved toward Janecka and Dietrich. Cazarez yelled "Taser, Taser, Taser," but Rosenthal kept moving toward Janecka and Dietrich.

Cazarez used the Taser on Rosenthal; Rosenthal went to the ground, but after about five seconds he tried to get up. Cazarez used the Taser again, causing Rosenthal to fall back to the ground. When Rosenthal tried to get up again, Cazarez used the Taser a third time. Rosenthal continued to struggle, while Dietrich and Janecka tried to handcuff him. For a couple of seconds, Janecka put some weight with either his knee or forearm across Rosenthal's back, at which point Rosenthal became unconscious, although he was still breathing.

3

One of the officers called for paramedics, who arrived within six minutes. Shortly thereafter, Rosenthal stopped breathing, and he went into cardiac arrest. Although the paramedics were able to restore Rosenthal's heartbeat and breathing, he suffered brain death and died five days later when the ventilator keeping him alive was removed in accordance with his family's wishes. An autopsy report by Joseph Cohen, M.D., listed the cause of death as lack of sufficient oxygen to the brain following cardiac arrest resulting from Rosenthal's hypertensive and atherosclerotic cardiovascular disease.

At trial on Green's claims for violation of Rosenthal's civil rights under section 1983, violation of the Fourteenth Amendment based on the alleged deprivation of her constitutionally protected due process rights to love, support, affection and companionship of her son, and wrongful death, the jury found that Janecka and Dietrich did not use excessive force and that although Cazarez did use excessive force, that force was not a substantial factor in causing Rosenthal's death. The court entered judgment in favor of the defendants and awarded them costs of $66,453.02—$40,610.68 of which was attributable to their presentation of certain evidence at trial.

## DISCUSSION

### I. *Admissibility of Evidence of Rosenthal's Use of Cocaine*

Green contends that the trial court committed prejudicial error in denying her motion in limine to exclude evidence that Rosenthal was under the influence of cocaine, and again overruling her objection during trial to the evidence of Rosenthal's cocaine intoxication at the time of the incident.

4

The trial court denied Green's in limine motion based on conflicting expert testimony in depositions. Green's expert, Werner Spitz, M.D., testified that Rosenthal was not under the influence of cocaine because only metabolites of cocaine, which cause no physiological effects, were detected in Rosenthal's blood. Joseph I. Cohen, M.D., an experienced coroner who performed the autopsy, disagreed. He testified in his pretrial deposition that the half life of cocaine in the blood is one to one and one-half hours, that cocaine metabolizes into byproducts within two to six hours of ingestion, with breakdown continuing in the test tube, and that Rosenthal's blood was not taken until after the incident and not analyzed until 10 days later. Considering these factors, and based upon his extensive training, experience and knowledge of scientific studies on the subject of cocaine metabolic breakdown, Dr. Cohen opined that Rosenthal had active cocaine in his system at the time of his arrest. In light of Dr. Cohen's opinion testimony, the court denied Green's motion in limine and ruled that evidence that Rosenthal was under the influence of cocaine would be admissible subject to establishing a proper foundation at trial.

At trial, Dr. Cohen testified that Rosenthal's death was proximately caused by lack of oxygen to the brain following heart stoppage, which was caused by Rosenthal's existing hypertensive and severe atherosclerotic heart disease. Dr. Cohen observed that Rosenthal's left anterior descending coronary artery was 95 percent occluded, leaving only a pinhole for passage of blood in a place where a blockage was life threatening (and thus widely referred to as a "widow maker") and that this same artery had another 60

5

percent blockage further downstream. He further testified that a single blockage of 75 percent was enough to cause sudden cardiac death.

Dr. Cohen also testified that Rosenthal's heart was severely enlarged from chronic hypertension, weighing 480 grams (as compared to a normal weight of 300 to 350 grams), which increased the likelihood of a cardiac arrhythmia, especially during exercise or stress, and sufficient to cause sudden cardiac death even without blockages. In Dr. Cohen's opinion, Rosenthal's underlying heart disease was the proximate cause of his death, irrespective of Cazarez's use of a Taser. Dr. Cohen also testified that "acute cocaine toxicity" was another significant factor in Rosenthal's death because cocaine constricts the arteries, causes the heart to race and increases the risk of arrhythmia. [1]

Green's expert pathologist, Dr. Spitz, testified that because no active cocaine was found in Rosenthal's bodily fluids, Rosenthal was not under the influence of cocaine. He conceded, however, that Rosenthal had used cocaine at some time before the incident because the tests were positive for cocaine metabolites. In contrast, Dr. Cohen opined to a reasonable degree of medical certainty that active cocaine was present in Rosenthal's body at the time of the incident based on the presence of cocaine metabolites and considering the delays from the time of the incident to the taking and processing of the blood. Dr. Cohen took into account that the half life of cocaine is one to one and one-half hours and the half life of metabolites is six to 10 hours. The tested amount of the

---

[1]    After Dr. Cohen began his testimony regarding the effects of cocaine on Rosenthal's heart, Green's counsel objected on grounds of lack of foundation and took Dr. Cohen on voir dire. The trial court overruled Green's objection.

metabolic byproduct of cocaine, benzoylecgonine, was not small and was consistent with amounts found in impaired drivers and others having adverse reactions to cocaine.

We review the trial court's ruling on the admissibility of expert testimony for abuse of discretion. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.) A ruling that constitutes an abuse of discretion has been described as one that is " 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Ibid.*) "The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness. The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied upon can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. The court does not resolve scientific controversies." (*Id.* at p. 772.)

Here, the trial court properly recognized a disagreement between two qualified medical experts as to whether the presence of a given level of metabolites of cocaine in Rosenthal's blood established he was under the influence. The trial judge correctly refused to resolve this scientific disagreement between the experts because the jury could reasonably conclude, based on the testimony of Dr. Cohen, that Rosenthal was under the influence of cocaine at the time of the incident. There was no abuse of discretion in this regard.

In a corollary argument, Green contends that the trial court should have excluded the evidence of cocaine intoxication under Evidence Code section 352 as unduly prejudicial. A decision to admit or exclude evidence under Evidence Code section 352 is

7

a matter committed to the discretion of the trial court and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.) Evidence Code section 352 is not designed to avoid damage from relevant, highly probative evidence; rather the prejudice that is to be avoided applies to evidence that " ' "uniquely tends to evoke an emotional bias against [a party] which has very little effect on the issues." ' " (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1008.) Evidence is not prejudicial simply because it undermines the opponent's position or shores up that of the proponent. (*Ibid.*)

Green cites *Hernandez v. County of Los Angeles* (2014) 226 Cal.App.4th 1599, 1613-1616 for the proposition that evidence of cocaine intoxication was prejudicial. However, the issue in *Hernandez* was relevance, not prejudice. The issue of intoxication was irrelevant because there was no expert testimony that intoxication caused injury, leaving the jury to speculate whether marijuana intoxication caused Hernandez's bad driving and questionable postaccident conduct which led to his death. However, here, Dr. Cohen's expert testimony positively established the causal connection between active cocaine toxicity and fatal heart arrhythmia. The trial court did not abuse its discretion in admitting Dr. Cohen's testimony.

## II. *Failure of the Trial Court to Instruct on Negligence*

In a civil case, the parties must present the trial court with paper copies of complete and comprehensive instructions (Code Civ. Proc., § 607a), and on appeal a party cannot predicate error on a refusal to give an instruction unless the proposed written

8

instruction is made a part of the record. (*Gaspar v. Georgia Pacific Corp.* (1967) 248 Cal.App.2d 248, 251.) If a party fails to do so, the court ordinarily has no duty to instruct on its own motion. (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 675.) Similarly, a trial court has no duty to modify or edit an instruction offered by either side in a civil case and if there is error in the charge proposed, the court may reject the entire instruction. (*Earnest W. Hahn, Inc. v. Sunshield Insulation Co.* (1977) 68 Cal.App.3d 1018, 1024.) Because exact wording of a proposed instruction is critical to proper appellate review and because the record must establish that the trial court had the opportunity to accept or reject a particular instruction, the proferred instruction must be made a part of the record.

Green contends that the trial court erred in refusing to give the general negligence instructions contained in CACI No. 400 (Negligence-Essential Factual Elements) and CACI No. 401 (Basic Standard of Care) to allow the jury to employ an ordinary negligence standard in evaluating the officers' tactical conduct and decisions preceding their use of deadly force. At trial, Green's counsel provided the court with instructions, including the general negligence CACI instructions, and provided written and oral argument that a general negligence standard should apply to police tactical considerations made before application of force.

However at oral argument on appeal, Green's counsel acknowledged that the CACI general negligence instructions did not apply to officers' prearrest tactical decisions but instead argued that a specialized instruction such as the new BAJI No. 3.43 based on

9

*Hayes v. County of San Diego* (2013) 57 Cal.4th 622 (*Hayes*)[2] should have been given. However, the trial record does not contain any instruction resembling BAJI No. 3.43 and only shows that Green's counsel orally requested and argued for the giving of the CACI general negligence instructions.

As Green's counsel now concedes, the general negligence instructions requested at trial did not provide the proper standard for evaluating officers' tactical decisions made before use of force. *Hayes* held that although law enforcement officers' tactical decisions before the use of force may be evaluated under a negligence standard, those tactical decisions must be considered as part of the totality of the circumstances preceding the application of force. (*Hayes, supra*, 57 Cal.4th at p. 639.) The Supreme Court in *Hayes* also stated that " '[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight.' [Citation.] In addition, '[a]s long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the "most reasonable" action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence.' " (*Hayes,* at p. 632.) Thus, law enforcement officers have a degree of discretion in deciding how to address a particular situation. (*Ibid.*) Because the record does not establish that Green's counsel provided the court with a correct written instruction on the standard of care applicable to officers'

---

2      Although *Hayes* was decided after the trial, the decision reflects existing law. (*Hayes, supra,* 57 Cal.4th at p. 637.)

10

prearrest use of force tactical determinations, we must reject his instructional error argument.

Further, any error in failing to give a negligence instruction regarding tactical decisions the officers made before using force was harmless. Instructional error in a civil case is not ground for reversal unless it is probable the error prejudicially affected the verdict. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.) In determining whether instructional error was prejudicial, a reviewing court must evaluate "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury that it was misled." (*Id.* at pp. 580-581, fn. omitted.)

Considering these factors, we conclude the court's refusal to give a general negligence instruction did not prejudice Green. She presented testimony of two expert witnesses on police practices who criticized the officers' tactical decisions. In addition Green's counsel argued to the jury that the officers acted unreasonably in their approach to a mentally ill person and should have acted in accordance with their training by offering to help. Counsel argued: "[E]very single thing [the officers] did from the moment they arrived . . . [¶] escalated the situation. They created their own need for the use of force, which you can't do. You can't create the situation . . . ."

In connection with Green's section 1983 claims, the jury was instructed that the officers could not use unreasonable force in taking Rosenthal into custody. Based on the evidence and after hearing argument of Green's counsel, the jury found that Cazarez used unreasonable force, but that the force was not a substantial factor in causing Rosenthal's death—that is, that the use of the Taser did not cause Rosenthal's death. Under these

11

circumstances, it is not reasonably probable that the court's failure to give a negligence instruction regarding officers' tactical decisions would have changed the outcome of the case.

III. *Failure to Properly Instruct on the Fourteenth Amendment Claim*

Green contends the instruction the trial court gave involving her Fourteenth Amendment claim was erroneous because it required the jury to find the officers acted with a purpose to cause harm unrelated to legitimate law enforcement objectives. Specifically, Green contends that, because the evidence showed that the officers had time to reflect before acting, the trial court should have instructed the jury that their deliberate indifference to the impact of their actions on Rosenthal was sufficient to establish liability. (See *Gantt v. City of Los Angeles* (9th Cir. 2013) 717 F.3d 702, 708 (*Gantt*).) However, in light of the jury's finding that two of the three officers did not use excessive force and that Cazarez's use of force did not cause Rosenthal's death, regardless of his state of mind, there would have been no reason for the court to give such an instruction.

In any event, the court correctly instructed the jury on the mental state required in a Fourteenth Amendment excessive use of force case under section 1983 because this case did not involve reflective decision making by the officers, but instead their reaction to fast-paced circumstances presenting competing public safety obligations. Given these circumstances, Green was required to prove that the officers acted with a purpose to cause harm to her son. (*Porter v. Osborn* (9th Cir. 2008) 546 F.3d 1131, 1138 (*Porter*).)

*Porter* is illustrative. There, a state trooper contacted the driver of a car that had been stopped for a long time at a highway rest stop. Within five minutes of the initial

12

contact, a trooper ordered the driver out of the car, pepper sprayed him, and fatally shot him when he tried to drive away. (*Porter, supra*, 546 F.3d at pp. 1132-1134.) The Ninth Circuit Court of Appeals reversed the trial court, which instructed the jury to choose between the intent to cause harm standard and the less demanding deliberate indifference standard. The *Porter* court reasoned that since the entire situation lasted just five minutes, fast action was required of the officer who had to repeatedly make split second decisions, and that under such circumstances, the purpose-to-cause-harm standard applied, even though the state trooper's actions may have helped create or even exacerbated the situation. (*Id.* at pp. 1132, 1136-1138.)

The facts in this case are similar to those in *Porter*. Faced with Rosenthal's bizarre behavior, refusal to heed instructions, and the potential threat to himself and others in the first five minutes after his initial contact with Rosenthal, Cazarez had to make a series of split second decisions as to whether and how to detain Rosenthal and what degree of force was required. Like the state trooper in *Porter*, Cazarez was involved in fast-paced circumstances that implicated public safety. (*Porter, supra,* 546 F.3d at p. 1139.) Thus, Cazarez could not be held liable unless he acted with a purpose to cause harm.

Green's reliance on *Gantt*, *supra*, 717 F.3d 702 is misplaced. That case is distinguishable because it did not involve an officer's split second decision making but rather the execution of a concerted plan, over a long period of time, by detectives who continued a murder investigation after they knew or should have learned that the defendants were innocent. The *Gantt* court, in holding that the purpose to harm standard did not apply, noted that, unlike the present case, none of the proffered evidentiary bases

13

for the claim involved a " 'snap judgment because of an escalating situation.' " (*Id.* at p. 707.)  Because the officers in the present case were required to make snap judgments in an escalating situation, the trial court correctly instructed that in order to establish the Fourteenth Amendment claim, Green was required to prove that the officers acted with a purpose to cause harm.

IV.  *Award of Trial Costs*

The defendants contend that Green's challenge to the cost award is not properly raised on appeal because she failed to separately appeal from the order awarding costs. We disagree.  A cost award that is incidental to a judgment may be challenged on an appeal from the judgment even though the amount of costs was filled in on the judgment after the notice of appeal was filed.  (*Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993, 996-997.)  Accordingly, we will consider Green's contention regarding costs.

Green contends that the court should not have awarded $40,610.68 in "paralegal" costs because there was no basis for awarding attorney fees as costs.  However, these costs reflected amounts the defendants incurred for preparation and presentation of electronic evidence, including videos of deposition testimony, exhibits and excerpts from audio recordings, at trial.

These costs are neither specifically allowable under Code of Civil Procedure section 1033.5, subdivision (a) nor prohibited by subdivision (b).  They may be awarded provided they are "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation." (*Id.*, subd. (c)(2); *Ladas California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774.)  Whether such costs were reasonably

14

necessary is a question of fact for the trial court and its decision is reviewed for abuse of discretion. (*Ladas California State Auto. Assn.,* at p. 774.)

Use of such technology, including a technician to monitor the equipment and quickly resolve any glitches, has become commonplace, if not expected by jurors. (*Bender v. County of Los Angeles* (2013) 217 Cal.App.4th 968, 990.) The trial court did not abuse its discretion in allowing these costs as reasonably helpful to aid the jury. (*Ibid.*; see *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017, 1057.)

### DISPOSITION

The judgment is affirmed in its entirety. The defendants shall recover their costs on appeal.

PRAGER, J.[*]

WE CONCUR:

NARES, Acting P. J.

HALLER, J.

---

[*] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.