Filed 4/29/22  Transmart v. San Francisco Bay Area Rapid Transit Dist. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| TRANSMART, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT, <br><br> Defendant and Respondent. | A159044, A160511 <br><br> (Alameda County Super. Ct. No. RG17853926) |

Plaintiff TransMart, Inc. (TransMart) entered into an option contract with defendant San Francisco Bay Area Rapid Transit System (BART) giving it the opportunity to lease space in BART's train stations for the purpose of developing retail space. When the deal fell apart and BART rejected TransMart's effort to exercise the option, TransMart brought this civil action for breach of contract.  A monthlong jury trial was held after which the jury returned a special verdict in favor of BART.  We affirm.

## I.  BACKGROUND

In 2008, real estate developer Alexis Wong (Wong) approached BART about a proposal to start a retail program in its train stations.  The general concept was that Wong's company, which eventually became TransMart, would lease space at

1

BART's 43 stations, build kiosks, and sublease the kiosks to various retailers who would serve BART's passengers. In 2011, BART and TransMart entered into an exclusive negotiating agreement.

On June 11, 2013, BART and TransMart executed a Lease Option Agreement (LOA) giving TransMart the right to lease space at BART stations for a period of 30 years with options to extend if it met a number of conditions precedent. The LOA required that all conditions precedent be met before BART would be obligated to perform. The project included four phases, each with specific designated stations and with specified option exercise dates. The termination date of the LOA was June 10, 2016.

Three of the conditions precedent are relevant to this appeal. First, TransMart needed to complete, and BART needed to approve, what the parties called Tier 1 and Tier 2 studies regarding the effect the proposed retail kiosks would have upon the stations. Tier 1 studies would examine the single issue of how passenger flow would affect the placement of the kiosks. Once the Tier 1 studies had been completed, Tier 2 would address the impact of the proposed kiosk locations on a wide variety of issues, including utilities, access improvements, station utility needs, security, wayfinding and existing retail and advertising.

Second, the LOA conditioned TransMart's exercise of the option on TransMart providing the necessary design documentation to obtain BART's approval of the design of the kiosks. The LOA stated that BART had to approve

2

"documentation that describes the design scope" "including concept drawings and one hundred percent (100%) design development and engineering drawings (the 'Design Documentation')."

Third, the LOA obligated TransMart to provide BART with proof of funding to show that it had enough money to complete the project. The proof of funding would show "TransMart's ability to fund one hundred percent (100%) of the costs of constructing the Retail Facilities on the applicable Leased Site," and provided that "[e]xamples of such evidence include binding written loan commitments . . . to fund construction of the applicable Retail Facilities in favor of TransMart."

TransMart submitted Phase 1/Tier 1 studies in October 2013, which were approved by BART the following month. TransMart did not, however, provide BART with Phase 1/Tier 2 studies until August 2015, almost two years later, when it submitted Tier 2 utility studies to BART.[1] These studies were only utility studies that did not complete other aspects of the Tier 2 analysis. BART also considered them to be flawed because they called for electricity to be drawn from BART's own supply, but because BART pays wholesale prices for electricity, it is limited as to who can use its electricity. Representatives of BART evaluated the studies and exchanged comments with TransMart, which submitted revised studies.

---

[1] The studies were completed in August 2014, but were not given to BART until a year later.

On September 30, 2015, the parties signed the First Amendment to Lease Option Agreement (First Amendment), which set the option exercise deadlines at December 31, 2015 for Phase 1 and March 31, 2016 for Phase 2. On December 30, 2015, TransMart notified BART that it was exercising its option for Phase 1. At the time, the Tier 2 Studies and the design approval had been submitted to BART but had not been approved.

On January 8, 2016, TransMart submitted its proof of funding for Phase 1: a cover letter from "blinq," which is the marketing brand for the TransMart retail program, and an attached bank statement for Lucendro Investment Fund relating to its account with the Singapore branch of Westpac, an Australian bank. According to Wong, Lucendro was owned by TransMart's major shareholder.

BART rejected TransMart's Phase 1 submission. The parties executed the Second Amendment to Lease Option Agreement (Second Amendment) which extended the deadline for Phase 1 to June 10, 2016 and the deadline for Phase 2 to August 31, 2016, and provided for no further extensions of the deadlines.

TransMart continued to work on its Tier 2 studies in 2016, and despite back-and-forth regarding revisions, BART concluded they were inadequate because they did not include an analysis of wayfinding conflicts or safety and the proposed placement of the kiosks conflicted with BART's existing advertising contracts. During the process of studying these issues, BART reduced the potential space for the kiosks, which TransMart considered significant (although the LOA did not guarantee TransMart any

4

particular space until the approvals for the option exercise were complete).

The parties also continued to work on the design documents, with TransMart submitting its proposals to BART and getting feedback. In May 2016, TransMart hired an architectural firm, TEF, which reviewed the design work done to date and marked the drawings with suggested improvements. These design documents were rough schematic designs, and indeed, were marked "DRAFT SCHEMATIC DESIGNS."

On June 10, 2016, TransMart provided its option exercise submittal package for Phase 1 to BART. BART had not approved TransMart's designs as of that date. BART formally rejected TransMart's attempt to exercise its option for Phase 1, citing several provisions it claimed TransMart did not satisfy—section 1.8 and 7.1(e) of the LOA (requiring 100% design documentation);[2] section 7.1(a) (requiring approval of Tier 1 and Tier 2 studies) and 7.1(d) (requiring sufficient proof of funds).

TransMart had submitted the Phase 2/Tier 1 studies to BART in December 2015. It began the Tier 2 studies and design

---

[2] In early 2014, TransMart had proposed a pilot program which would install temporary retail kiosks at some stations. The LOA did not contemplate a pilot program, and the parties set up the program through a separate permit to enter, which did not require approval from BART's board. TransMart installed two pilot program kiosks in November 2015. In his closing argument, counsel for TransMart argued that because BART had approved the design of the kiosks in the pilot program, those standards applied to the LOA, and BART's rejection of the design documents was unreasonable.

drawings for Phase 2 and continued to use TEF. Viral Vithalani was the architect with TEF who worked on Phase 2 beginning in June 2016. He started from scratch because BART had not approved Phase 1, and he submitted design documents and Tier 2 studies on July 22, 2016. Although these documents were an improvement over TransMart's past submissions, BART identified several issues with the studies and drawings: (1) sight-line issues; (2) failure to identify components of a proposed electrical closet; (3) conflicts with existing signage; (4) conflicts with modernization projects BART had scheduled in the future; (5) a failure to mitigate impacts to sprinklers that the kiosks would cause; and (6) a failure to include all the necessary structural details.

On August 30, 2016, one day before the deadline for exercising the Phase 2 option, Wong sent documentation to BART to satisfy the proof of funding requirement. This included a letter from Boris Schakowski of ASTC Investment Pte Ltd, stating that ASTC was a "significant stakeholder" in TransMart, and that ASTC was holding $7,000,000 for TransMart to fund construction of Phase 2. TransMart submitted its paperwork to attempt to exercise its option for Phase 2 on August 31, 2016. BART rejected the attempt to exercise the option on Phase 2 for the same reasons that it had rejected the attempt to exercise the Phase 1 option.

TransMart filed suit against BART in March 2017. The operative complaint is TransMart's first amended complaint, which asserts two counts: breach of contract and breach of the

6

implied covenant of good faith and fair dealing. TransMart alleged that BART breached the LOA by denying TransMart's notice of exercising its option, TransMart having either complied with its obligations under the contract or having been excused from doing so because of BART's actions.

The case proceeded to jury trial, and the issue of damages was bifurcated from the issue of liability. TransMart took the position that it had complied with its obligations but had been stymied by BART's actions in unreasonably withholding its approvals, misinterpreting the contract and unreasonably delaying the project. TransMart blamed BART for its delays in presenting the design documentation and Tier 2 studies, because the retail kiosks were required to meet BART's "Design Standards," which it was supposed to approve by September 13, 2013, but which it did not finalize until March 2014. TransMart also maintained that it was waiting for BART to set up a Design Review Committee made up of volunteer architects, which BART discussed forming in 2014 but which never got off the ground.

BART disputed that it was the cause of TransMart's delays. According to Paul Voix, BART's "point man" on the project, the completion of the Design Standards was a joint effort between TransMart and BART, and delays in completing them did not impact TransMart's ability to pursue other parts of the project. BART also presented evidence that the Design Review Committee was not contemplated by the LOA, and that BART had advised TransMart it was unlikely to be formed. In any

event, the Design Review Committee would not have replaced the need for BART approval of the project.

The jury returned a special verdict finding that TransMart did not do all the things it was required to do to exercise its option for Phase 1 and Phase 2. It made a similar finding on TransMart's claim for breach of the implied covenant of good faith and fair dealing. The trial court entered judgment in favor of BART and awarded attorney fees and costs. TransMart has filed separate appeals from the judgment and the attorney fee award, which were consolidated on TransMart's unopposed motion.[3]

## II.  DISCUSSION

### A.  *Exclusion of Extrinsic Evidence to Prove Ambiguity*

TransMart maintained that the terms "Design Documentation" and "Tier 2 Studies" were ambiguous as used in the LOA, and it filed a pretrial memorandum asking the court to allow it to present extrinsic evidence as to the meaning of those terms. The trial court did not hold a pretrial hearing on the issue and advised the parties during a conference on jury instructions that the terms were "susceptible to the plain and reasonable meaning by the jurors." TransMart now argues that it should have been permitted to introduce extrinsic evidence to prove the meaning of the terms. We disagree there was any error requiring reversal.

---

[3] TransMart has not raised any issues relating to the attorney fees and costs.

Some context is in order. We begin by observing that one of the primary points of dispute in this case was whether TransMart had either fulfilled the requirements of the LOA, or had been prevented from doing so by BART's delays, such that BART was required to accept TransMart's attempt to exercise its option when notice was tendered. As part of its efforts to prove that it had held up its end of the bargain, TransMart claimed that its schematic drawings, which did not include the interior designs of the kiosks,[4] complied with the requirement to provide Design Documentation, which was defined by paragraph 1.8 of the LOA as "including concept drawings and one hundred percent (100%) design development architecture and engineering drawings." BART, on the other hand, took the position that "one hundred percent (100%) design development" meant that the plans would be sufficiently detailed, interiors included, that they could be turned over to a contractor to be built ("buildable and biddable"), and that the draft schematic plans submitted by TransMart fell short.

TransMart notes that another point of contention, besides the degree of detail required in the design documents, was the meaning of and the responsibility for performing the Tier 2 studies called for by the LOA. Although BART claimed that because no Tier 2 study was ever approved, TransMart had failed

---

[4] TransMart claims that because it would be a master tenant that would rent to other businesses, it did not yet know who its tenants would ultimately be and it was impossible to design the interiors of the kiosks until the ultimate user was ascertained.

to perform one of the conditions precedent under the LOA, TransMart claimed that BART was responsible for performing the bulk of the Tier 2 studies and that TransMart was not responsible for the fact that Tier 2 studies had not been approved before the deadline.

Under the parol evidence rule, the court generally may not consider parol or extrinsic evidence " 'of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract.' " (*Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 432; see also Code Civ. Proc., § 1856, subd. (a).) However, extrinsic evidence is admissible to " 'prove a meaning to which the language is reasonably susceptible.' " (*Goldstein, supra,* 34 Cal.App.5th at page 432.)

We assume for the sake of argument that TransMart is correct in asserting that the terms "Design Documentation" and "Tier 2 Studies" were ambiguous, and that extrinsic evidence was admissible to prove that the terms were reasonably susceptible to the meanings ascribed to them by TransMart. But TransMart suggests the court excluded all extrinsic evidence on the ambiguity whereas in fact TransMart was allowed to present such evidence at trial.[5] For example, TransMart presented testimony by Wong that the "100 percent design" condition did not require TransMart to include interior details of the kiosks or

---

[5] At one point, the court stated, "Counsel, to be clear, the court has no problem with you pointing to language in the lease option agreement and asking her what she understood that meant."

10

required the plans to be biddable, and Vithalani testified that he thought the final design submission was in substantial conformity with BART's Design Guidelines. This stood in contrast to the testimony of witnesses for BART, to the effect that "one hundred percent (100%) design" meant a complete design, interiors included, that was construction-ready and could be turned over to a contractor ("buildable and biddable").

"Where the interpretation of contractual language turns on a question of the credibility of *conflicting* extrinsic evidence, interpretation of the language is not solely a judicial function. [Citations.] As trier of fact, it is the jury's responsibility to resolve any conflict in the extrinsic evidence properly admitted to interpret the language of a contract." (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912–913; *City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395 [jury may interpret agreement when construction turns on the credibility of evidence].) This is what happened here: the jury was charged with determining which side's view of the disputed evidence was correct.

To the extent the trial court indicated it would exclude evidence regarding the disputed terms that predated the LOA, TransMart has failed to identify any particular items of extrinsic evidence that it was prevented from introducing at trial. "By appealing, [TransMart] assumed 'the burden of showing reversible error by an adequate record.' [Citation.] One aspect of that burden requires that the appellant develop the fullest possible evidentiary record *before* seeking review. Thus,

11

an appellant must make an offer of proof in the trial court in order to claim on appeal that evidence was wrongly excluded. [Citation.] Similarly, if an appellant wishes to argue a point on appeal, it must first make a record by raising the point in the trial court. [Citations.]" (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1433.) TransMart did not carry its burden of demonstrating reversible error.

We reject TransMart's suggestion that *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1350–1351 (*Wolf*) automatically requires reversal any time a court erroneously rules that extrinsic evidence is not admissible to prove the meaning of an ambiguous term in a contract, without an evaluation of prejudice. *Wolf* involved a writ that challenged an order granting summary adjudication that was entered because the trial court determined that a contractual term ("gross receipts") was unambiguous and not reasonably susceptible to the interpretation offered by the plaintiff. (*Id.* at pp. 1346–1350.) The appellate court granted the writ, concluding that there was a triable issue as to the meaning of the term and that the trial court erred in excluding extrinsic evidence offered to show there was an ambiguity and to interpret the term. (*Id.* at pp. 1359–1360.) *Wolf* did not involve the resolution of an ambiguity by the jury, and does not suggest that harmless error analysis is inapplicable when the jury is given the task of interpreting a contract.

B. *Rejection of CACI No. 314*

The court instructed the jury with CACI No. 318, which provided, "In deciding what the words in a contract meant to the parties, you may consider how the parties acted after the contract was created but before any disagreement between the parties arose." It declined TransMart's oral request to also give CACI No. 314, which would have identified the disputed language in the LOA and advised the jury, "In deciding what the words of a contract mean, you must decide what the parties intended at the time the contract was created. You may consider the usual and ordinary meaning of the language used in the contract as well as the circumstances surrounding the making of the contract." TransMart contends the court erred in failing to give the requested instruction.

BART responds that while TransMart requested CACI No. 314 orally, the court did not abuse its discretion in denying the instruction because TransMart never included a written copy in the packet of proposed jury instructions. (*Green v. County of Riverside* (2015) 238 Cal.App.4th 1363, 1370–1371 [counsel must provide court with correct written instruction].) But assuming TransMart's oral request for the instruction was sufficient to preserve the issue, there was no reversible error.

"A party is not entitled to have the jury instructed in any particular fashion or phraseology, and may not complain if the court correctly gives the substance of the applicable law." (*Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 553.) "[T]here is no rule of automatic

13

reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission.  A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' "  (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 (*Soule*), quoting Cal. Const., art. VI, § 13.)

Here, the court instructed the jury on the elements of breach of contract, that the words in a contract should be given their ordinary meaning unless otherwise provided or unless they have a technical definition, that in interpreting the contract they should look to the contract as a whole, that the jury could consider the parties' actions after the contract was executed in interpreting the contract, that if no time for performing an act was specified it was deemed to require performance within a reasonable time, and that BART only had continuing obligations under the LOA if TransMart met specified conditions precedent. (CACI Nos. 300, 303, 315, 316, 317, 318, 319, 322.)  The jurors were not instructed to construe the disputed terms of the contract in any particular fashion, and were well aware that BART and TransMart disagreed about the meaning of those terms.  It is not reasonably probable that the jury would have reached a different result had CACI No. 314 been given.  (*Soule*, *supra*, 8 Cal.4th at pp. 580–581.)

14

### C. *Proposed Special Instruction on Reasonableness*

TransMart was required to satisfy conditions precedent before it exercised its option. The LOA gave BART the discretion to review and approve various pieces of documentation necessary to satisfy those conditions. TransMart requested a special jury instruction that would have required BART's discretion in this regard to be reasonable.[6] The trial court refused the instruction, instead reading a special instruction that mirrored the language in the contract defining the relevant conditions precedent.[7] We disagree that this was error.

---

[6] TransMart's proposed special instruction would have provided: "A contract may give one of the parties discretionary power . . . to protect its interests or to make sure that it will receive the benefits of the contract. When the contract does this, the law requires the party to use their discretion reasonably. This means that the party who is given the discretionary power to do something to protect its own interests may not use that discretionary power to unreasonably or unfairly harm the other party or to deprive the other party of the benefits of the contract. [¶] For example, with respect to the Lease Option Agreement, BART's approval is required before TransMart could move forward. The law requires BART to be reasonable in its approval and not to unreasonably or unfairly harm TransMart or to deprive TransMart of the benefits of the contract."

[7] The court gave a modified version of CACI No. 322, which provided, "The parties agreed in their contract that BART would not have to continue with its obligations under the Lease Option Agreement unless TransMart met all of the following conditions precedent set forth in the Lease Option Agreement: [¶] (a) On or before the date TransMart delivers the Option Notice for any Leased Site, TransMart shall have delivered to BART the Tier 1 Study and the Tier 2 Study Materials for such Leased Site and BART shall have Approved the Tier 1 Study and the Tier 2 Study and related analysis for such Leased Site. [¶] (b) On or before

15

TransMart relies primarily on *Guntert v. City of Stockton* (1974) 43 Cal.App.3d 203 for the proposition that absent an explicit provision to the contrary, a contractual directive that one party exercise its discretion will be construed to require an objective, "reasonable person" standard rather than a subjective standard. (*Id.* at 211–213, 217; see also *FEI Enterprises, Inc. v. Yoon* (2011) 194 Cal.App.4th 790, 805–806.) Nothing in *Guntert* suggests it is error to instruct in the actual language of the contract, as the court did here. In any event, the special instruction that was given by the court did not suggest a subjective standard applied.

Moreover, as BART notes, the issue of whether it was required to exercise its discretion reasonably was never an issue.

—————————

the date TransMart delivers the Option Notice for any Leased Site, TransMart shall have received all Approvals as may be required for the development of the applicable Leased Site. [¶] (d) On or before the applicable Exercise Deadline, BART shall have approved, in BART's reasonable discretion, TransMart's ability to fund one hundred percent (100%) of the costs of constructing the Retail Facilities on the applicable Leased Site. . . Examples of such evidence include binding written loan commitments or other binding commitments. . . . [¶] (e) On or before the applicable Exercise Deadline, the Design Documentation for the applicable Retail Facilities shall have been Approved by BART in accordance with Section 1.8 of the Lease Option Agreement. [¶] BART contends that these conditions did not occur and that it did not have a duty to continue with any obligations under the Lease Option Agreement. To overcome this contention, TransMart must prove that it satisfied all of the above conditions. [¶] If TransMart does not prove that it satisfied the above conditions, then BART was not required to continue with any obligations under the Lease Option Agreement; and was entitled to terminate the contract."

16

None of the witnesses for BART ever suggested they were entitled to act arbitrarily in reviewing TransMart's submissions; rather, they took the position that BART at all times acted reasonably during the process. During closing argument, counsel for BART acknowledged that BART's actions under the LOA had to be reasonable.[8] TransMart obviously disputed that BART had acted reasonably, but there is no reasonable probability that the omission of the special jury instruction was the cause of the jury's finding in favor of BART. (*Soule, supra*, 8 Cal.4th at pp. 580–583.)

D. *Proof of Funding*

The LOA required TransMart to provide proof of funding to BART as a condition precedent to it exercising the option. The court excluded all evidence relating to proof of funding which had not been presented to BART as irrelevant to the question of whether BART had acted reasonably in rejecting it. TransMart claims that in light of this ruling, the court erred in allowing BART to present evidence that TransMart had caused delays on the project by failing to pay its subcontractors, regardless of whether BART knew about the issues with the subcontractors. We disagree.

A trial court has broad discretion in making evidentiary rulings at trial, and will be deemed to have abused that discretion only when it acts in an arbitrary, capricious or absurd

---

[8] "[Section] 1.8 [of the LOA] again doesn't say, you know, BART controls it, BART can do whatever it wants. It says it has to be reasonable. And I don't dispute that."

manner resulting in a manifest miscarriage of justice. (*Condon-Johnson & Assocs., Inc. v. Sacramento Mun. Util. Dist.* (2007) 149 Cal.App.4th 1384, 1392.) Here, BART moved in limine to prevent TransMart from introducing evidence to show it had sufficient funding for the project if that information had not been presented to BART, reasoning that because the issue was whether BART had acted reasonably in rejecting TransMart's proof of funding, information that was not presented to BART, and which BART did not know about, was irrelevant. (Evid. Code, § 210.) The court granted the motion. This was not an abuse of discretion and indeed, TransMart's counsel appeared to agree with the ruling, at least to the general principle that evidence not provided to BART was not admissible on the issue of whether BART acted reasonably in rejecting TransMart's proffered proof of funding.

TransMart complains that the court admitted evidence of TransMart's indebtedness to its contractors without a showing that BART was aware of this indebtedness, arguing that this was inconsistent with its ruling that proof of funding information was only relevant if BART knew about it. But the challenged evidence concerning TransMart's indebtedness was admitted on the issue of whether TransMart had caused delays by failing to pay some of the contractors it hired, an issue which is distinct from the sufficiency of the proof of funding it presented to BART.

TransMart offered the testimony of Raghav Bindhumadhavan, a representative of one of TransMart's investors (ASTC), who had authored the letter that was given to BART as an attempt to satisfy the proof of funding requirement

18

for Phase 2.  Among other things, Bindhumadhavan would have explained that "ASTC has a direct stake in TransMart." TransMart suggests the court should have allowed Bindhumadhaven to testify and explain the relationship between ASTC and TransMart, but Wong explained the relationship in her testimony.[9]  There was no abuse of discretion in admitting evidence of BART's indebtedness, or in excluding the testimony of Bindhumadhavan.

## III.  DISPOSITION

The judgment is affirmed.  Costs to respondent.

---

[9] TransMart complains that in closing argument, counsel for BART "leveraged" the court's ruling by characterizing the proof of funding submission for Phase 2 as a " 'funky little document' " from a "stranger, really, some guy named Boris who says yeah, funds are available."  The "funky little document" comment was made regarding the proof of funds for the Phase 1 submission, rather than the submission for Phase 2, but the reference to a "stranger. . . named Boris" was a fair argument that BART had not been adequately advised of the relationship between ASTC and TransMart, regardless of the actual relationship between the two companies, or provided with the documentation necessary to prove there was a binding commitment for ASTC to provide the funds.  In any event, there was no objection to this argument.  (See *Cain v. State Farm Mut. Auto. Ins. Co.* (1975) 47 Cal.App.3d 783, 801.)

19

_____

NEEDHAM, J.

We concur.

_____

JACKSON, P.J.

_____

SIMONS, J.

*Transmart v. S.F. Bay Area Rapid Transit Dist.* /A159044